UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


| | | |
|---|---|---|
| TERRY LYNN KING, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 3:99-cv-454 |
| | ) | (Jordan/Shirley) |
| | ) | |
| RICKY BELL, Warden, | ) | |
| | ) | |
| Respondent. | ) | |


## <u>MEMORANDUM</u>


This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner Terry Lynn King ("King") is incarcerated on death row. The matter is before the

court on the respondent's motions for summary judgment and King's response thereto. For

the following reasons, the motions for summary judgment will be **GRANTED** and the

petition for habeas corpus relief will be **DENIED**.

## I.    Factual Background and Procedural History

The respondent has provided the court with copies of the relevant documents as to King's direct appeal and post-conviction proceedings. [Court File No. 10, Notice of Filing Documents, Addenda 1-4].[1] King was convicted of first degree murder in the perpetration of simple kidnaping by confinement (felony murder), and armed robbery.[2] He was sentenced to death on the felony murder conviction and to 125 years imprisonment on the armed robbery conviction. The convictions and sentences were affirmed on direct appeal. *State v. King*, 718 S.W.2d 241 (Tenn. 1986).[3]

King next filed a petition for post-conviction relief, which was denied after an evidentiary hearing. The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *King v. State*, No. 03C01-9601-CR-00024, 1997 WL 416 389 (Tenn. Crim. App. July 14, 1997), *perm. app. granted, id.* (Tenn. Dec. 8, 1997). The Tennessee Supreme Court granted King's application for permission to appeal, pursuant to Rule 11 of the

---

[1]Addendum 1 contains the technical record (one volume) and transcripts and exhibits (22 volumes) of King's trial proceedings; Addendum 3 contains the technical record (five volumes), transcripts and exhibits (six volumes), pre-hearing transcript (one volume), and appendix (one volume) of King's post-conviction proceedings. Generally, the volume number of the transcripts and other documents in the state record does not correspond to the volume number listed by the respondent. The court's reference to the record is to the volume number listed by the respondent.

[2]King was also convicted of aggravated kidnaping; that conviction was set aside by the trial court on King's motion for judgment of acquittal.

[3]King's co-defendant, Randall Joe Sexton, was tried in the same trial with King and was also convicted of felony murder and armed robbery; Sexton was spared the death penalty by the jury and instead was sentenced to consecutive sentences of life in prison and 125 years, respectively. *State v. Sexton*, 724 S.W.2d 371 (Tenn. Crim. App.), *perm. app. denied, id.* (Tenn. 1986).

2

Tennessee Rules of Appellate Procedure, and subsequently affirmed the denial of post-conviction relief. *King v. State*, 989 S.W.2d 319 (Tenn.), *cert. denied*, 528 U.S. 975 (1999). King then filed the pending petition for federal habeas corpus relief.

The facts that led to King's convictions are set forth in detail in the opinion of the Tennessee Supreme Court on direct appeal as follows:

> The victim of both crimes for which defendant stands convicted was Diana K. Smith. Mrs. Smith left her home on Sunday afternoon, July 31, 1983, to go to a nearby McDonald's to get food for her family. Her automobile, a 1979 Camaro, was found on August 4, 1983, off the road in a heavily wooded area near Blaine, Tennessee.

> On August 6, 1983, Mrs. Donna Allen went to the Asbury quarry in Knox County to swim. She noticed a strange odor coming from a yellow tarpaulin in the water near the bank, and reported the circumstance to the sheriff's office. On following-up Mrs. Allen's report, officers found the body of a white female in an advanced state of decomposition. The body was later identified as being that of Mrs. Smith. Death was from one or more shots fired into the back of Mrs. Smith's head from a high-powered weapon.

> In the course of the police investigation, the attention of the officers was focused on Terry King and Randall Sexton when Jerry Childers[4], an acquaintance of King, reported a conversation he had had with King and what he had found when he followed up on the conversation.

> Jerry Childers testified that Terry King came to his house on the afternoon of Monday, August 1, 1983, and inquired as to whether Childers knew anyone that wanted to buy parts from a 1979 Camaro. According to Childers, King told Childers he had killed the woman who owned the automobile after she threatened to charge defendant with rape. According to Childers, defendant said he made the woman get out of the car trunk where he had confined her and lie face down on the ground, that the woman faced the defendant and begged him not to shoot her and offered money, and that he

---

[4]The witness's name was actually Jerry Dean Childress. [Addendum 1, Transcript of the Trial, Vol. X, p. 51].

3

ordered her to turn her head away from him. When she did, he shot her in the back of the head. Defendant also told Childers he took forty dollars from the woman as well as taking her automobile.

The following Friday, which was August 5, 1983, Childers related defendant's story to Mr. Buford Watson. On Sunday, Childers went to the location defendant had described as the place of the killing and found something with hair on it. Childers then gave the information he had to Detective Herman Johnson of the Knox County Sheriff's Department and T.B.I. agent, David Davenport. In following up the report, the officers met Childers near Richland Creek and searched the area, finding pieces of bone, hair, and bloodstains. A later more thorough search turned up bullet fragments and additional bone fragments.

In the course of the police investigation, defendant and co-defendant, Sexton, were interviewed by the officers. Both gave written statements detailing the events of the night of July 31, 1983. Neither defendant testified in the guilt phase of the trial, but their statements were introduced in evidence. Both defendants testified in the sentencing phase of the trial and repeated in substance the facts set forth in the statements given the police officers in their statements.

The statements of King and Sexton were markedly similar for the time the two men were together. King's statement was the more comprehensive since it covered the entire period of time he was with Mrs. Smith. According to defendant, he and his cousin, Don King, picked up Mrs. Smith at the Cherokee Dam on Sunday, July 31, 1983. Defendant drove Mrs. Smith in her automobile to the nearby house trailer of his cousin, arriving there around 7:00 p.m. Don King drove his own automobile to the trailer. Shortly after arriving at the trailer, defendant called Eugene Thornhill who came to the trailer and left with defendant to obtain LSD and quaaludes. Defendant said he and Mrs. Smith took the drugs. Thereafter, defendant, Don King, and Eugene Thornhill had sex with Mrs. Smith.

After staying at the trailer for several hours, defendant and Mrs. Smith left in her automobile, with defendant driving. They went to a wooded area, where they again had sex. From there, they went to a service station for gas. Mrs. Smith got out of the automobile and grabbed the keys. Defendant told her to get back in the automobile and she did so. The defendant drove Mrs. Smith back to the wooded area, where they again had sex and the defendant took forty dollars from Mrs. Smith. According to defendant, Mrs. Smith then asked

"why did you all rape me?" Defendant stated that he knew then what he was going to do. He told Mrs. Smith to get into the trunk of the automobile. When she did, defendant drove to Sexton's house and told Sexton he had a woman in the trunk of the automobile and needed Sexton's help. Defendant got a rifle from Sexton and also a shovel. Defendant and Sexton then left the Sexton home in separate automobiles. After making a stop at a Publix station to purchase gas, defendant and Sexton drove to a wooded area near Richland Creek in Knox County. Defendant drove the 1979 Camaro off the road and became stuck. He then made Mrs. Smith get out of the automobile trunk and pointed the loaded rifle at her. Defendant made Mrs. Smith lie down on the ground, assuring her that he was not going to kill her, that others were coming to have sex with her. Sexton left in his automobile to return a funnel to the gas station. While he was gone, defendant shot Mrs. Smith in the back of the head. On Sexton's return, and after getting the Camaro unstuck, the two went through Mrs. Smith's effects, burning her identification. They then attempted to bury the body, but gave up because of the hardness of the ground. The next morning, defendant and Sexton wrapped Mrs. Smith's body in a tent, weighted it with cinder blocks and dumped it in the Asburn quarry. Mrs. Smith's automobile was hidden near Sexton's house.

Agent Davenport testified that after making his statement, the defendant took him and other officers to the place where the Camaro was hidden and defendant also showed them where he had hidden the automobile license plate in a hollow tree. The defendant also showed the officers where he had placed the body in the quarry and where the shooting occurred.

Tommy Heflin, a firearms examiner for the Tennessee Bureau of Investigation, testified that he had examined the .30 Marlin rifle belonging to Sexton, the metal bullet jacket, and fragments recovered from the scene of the killing. According to Mr. Heflin, the intact metal jacket had been fired from Sexton's rifle and the fragments were fired from a rifle with the same rifling characteristics as Sexton's rifle. Mr. Heflin was of the opinion that at least two bullets had been fired.

Dr. Joseph Parker, who performed an autopsy on the body of Mrs. Smith, testified that death was due to an extensive head injury consistent with gunshot wounds from a high-powered rifle.

Over objection, the State also presented evidence through Lori Eastman Carter that defendant had attempted to kill her on October 13, 1982. According to Mrs. Carter, King hit her with a slapstick numerous times, while repeatedly

5

asking her "how it felt to be dying, so that the next woman he killed he would know how she felt." Mrs. Carter testified that she lost consciousness. When she came to, she was still in her automobile with her hair rolled up in the window. She further testified that she heard defendant tell his cousin that he had killed her and wanted James King to help him put her in a quarry and burn her automobile.

James King disputed Mrs. Carter's version of events, saying that defendant came to King's home to get him to follow defendant to St. Mary's Hospital as Mrs. Carter was ill and needed treatment.

Karen Greeg, Lori Carter's sister, testified that Mrs. Carter can not be believed, even under oath.

The defendant offered no other evidence in the guilt phase of the trial.

On considering the evidence, the jury found that the defendant and Randall Sexton were guilty of murder in the first degree in killing Diana K. Smith in the perpetration of a simple kidnapping by confinement and of armed robbery. In our opinion the evidence is overwhelming and supports the jury's verdict.

*State v. King*, 718 S.W.2d at 243-45.

With respect to the imposition of the death penalty, the Tennessee Supreme Court also

detailed the supporting facts:

As to the sentencing phase of the trial, the State relied upon evidence introduced during the guilt phase. In addition, the State introduced evidence showing that the defendant and Sexton had been convicted previously of murder in the first degree by use of a firearm in perpetration of armed robbery and of aggravated kidnapping, both offenses being committed on July 2, 1983, less than a month before the defendants killed Mrs. Smith.[5] The State also introduced evidence that the defendant had been convicted of an assault with

_____

[5]King was convicted of the first degree murder and aggravated kidnapping of Todd Lee Millard in Grainger County, Tennessee. The authorities learned of King's involvement during questioning of King and Sexton with respect to Ms. Smith's murder. *See, e.g., King v. Dutton*, 17 F.3d 151 (6th Cir. 1994). This conviction and it use as an aggravating circumstance are discussed in more detail with respect to claim VIII, *infra* at 71-73.

intent to commit aggravated kidnapping, which was committed only three days after the killing of Mrs. Smith.

In response, the defendant called numerous witnesses who testified that he had been a heavy user of drugs and alcohol for a number of years, and that their use could be expected to and did affect his judgment and actions. Further, there was expert medical proof that the effect of LSD and quaaludes, which defendant claimed to have taken on July 31, 1983, could be expected to continue for 8 to 12 hours after their ingestion. There was also evidence that defendant was remorseful, and that he had caused no disciplinary problems at the prison and had been moved from close security to medium security.

Both the defendant and Sexton took the witness stand in the sentencing proceeding, and their testimony substantially followed the statements they gave the police. The defendant did deny forming the intent to kill Mrs. Smith before he went to Sexton's house, insisting that he went there only for advise on what to do. He further testified that he got the rifle at Sexton's direction and formed the intent to kill Mrs. Smith after he took her to the place she was shot. Defendant stated he related the events of Mrs. Smith's death to Jerry Childers because it was bothering him. He denied telling Childers that Mrs. Smith begged for her life. On cross-examination, defendant admitted committing two armed robberies in January, 1980, when he was a juvenile.

Sexton testified generally in accord with the statement he had given the police. He denied having advised defendant to kill Mrs. Smith, but admitted that he gave defendant the weapon used in the murder and accompanied him to the death scene, knowing that Mrs. Smith was confined in the trunk of the automobile driven by the defendant. Sexton also helped in trying to dispose of the automobile, in destroying all Mrs. Smith's identification and in disposing of her body.

On considering this evidence, the jury returned the sentence of death against the defendant. Sexton was sentenced to life imprisonment, evidently because he was not present at the moment of the killing and did not shoot Mrs. Smith. In imposing the sentence of death on the defendant the jury expressly found that:

(1) the defendant was previously convicted of one or more felonies, other than the present charge, which involved the use of threat of violence to the person;

(2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind;

(3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant or another; and

(4) the murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any rape, robbery, larceny or kidnapping. The jury also found that there was no mitigating circumstance sufficiently substantial to outweigh the statutory aggravating circumstances found by the jury.

*Id*. at 247-48 (internal citations omitted).


II.    Standard of Review


The Attorney General contends that several of King's claims are procedurally defaulted. As to the remaining claims, the Attorney General argues that the respondent is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.


*A. Procedural Default*

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly

8

presenting the legal and factual substance of every claim to all levels of state court review.").

Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

King cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(a). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v.*

*Nunnemaker*, 501 U.S. 797, 801 (1991). Therefore, to excuse his procedural default, King must first demonstrate cause for his failure to present an issue to the state courts. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

## B. State Court Findings

Pursuant to 28 U.S.C. § 2254(d), King may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and King must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision "involves an unreasonable application of clearly established Federal law"

only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

## C. Motion for Summary Judgment

The respondent filed a motion for summary judgment and, after King filed his amended petition for the writ of habeas corpus, a second motion for summary judgment. It is well established that a motion for summary judgment, as provided in Rule 56 of the Federal Rules of Civil Procedure, is applicable to habeas corpus proceedings and allows the court to assess the need for an evidentiary hearing on the merits of the habeas petition. *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). *See also Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986); *Securities and Exchange Commission v. Blavin*, 760 F.2d 706, 710 (6th Cir. 1985).

The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). Once the moving party presents evidence sufficient to support a motion for summary judgment, the non-moving party is not entitled to a trial merely on the basis of allegations. The non-moving party must present some significant probative evidence to support its position. *White v. Turfway Park Racing Association, Inc*., 909 F.2d 941, 943-44 (6th Cir. 1990); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

Summary judgment should not be disfavored and may be an appropriate avenue for the "just, speedy and inexpensive determination" of an action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

III.    Claims for relief

The court will consider King's claims for relief, as presented in his amended petition for writ of habeas corpus and set forth below in bold, in turn and in light of the respondent's second motion for summary judgment.

**I.      The trial court's failure to grant a severance of co-defendants in this case violated the federal constitution under *Bruton/Cruz* and further violated Mr. King's right to due process at sentencing when the antagonistic defenses of co-defendant turned co-defendant's counsel into a private prosecutor.**

12

### A. The finding of guilt of first-degree murder was constitutionally infirm because of serious *Bruton/Cruz* errors which were demonstrably prejudicial to Terry King.

This claim specifically refers to the statement of co-defendant Sexton as it related to the testimony of Lori Eastman Carter ("Carter"). The Tennessee Court of Criminal Appeals summarized the issue as follows:

> The crux of the petitioner's argument is based on a single statement contained in Sexton's confession: "Terry said he wasn't going to let her go, because he was afraid he would get in the same mess he got into with Lori." This "same mess" was not specifically explained. However, Lori Eastman Carter testified during the guilt phase that the defendant had assaulted her in 1982 and that she had subsequently sworn out a warrant against him. She also testified that, during the assault, the petitioner had told her to "tell him how it felt to be dying, so that the next woman he killed he would know how she felt."

*King v. State*, 1997 WL 416389 at *7.

Neither King nor Sexton testified during the guilt phase of the trial, but their written statements were introduced into evidence; the trial court instructed the jury that each statement could only be considered as evidence against the defendant who made the statement. *State v. King*, 718 S.W.2d at 244; *King v. State*, 989 S.W.2d at 328.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that, in a joint trial where a co-defendant does not take the stand, the admission of the co-defendant's statement that inculpates the petitioner is a violation of the petitioner's right of cross-examination under the Confrontation Clause of the Sixth Amendment. *Id.* at 126. Nevertheless, the Supreme Court subsequently held that a *Bruton* violation can constitute harmless error in light of the weight of additional evidence against the defendant.

13

*Harrington v. California*, 395 U.S. 250, 253 (1969). As stated by the Supreme Court in

*Schneble v. Florida*, 405 U.S. 427 (1972):

> The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

*Id*. at 430.

On direct appeal, the Tennessee Supreme Court considered King's claim of a *Bruton*

violation and found no error. The court specifically found, based upon *Parker v. Randolph*,

442 U.S. 62 (1979), that there was no *Bruton* violation in the admitting Sexton's statement

and thus the trial court did not err in refusing to grant a severance. *State v. King*, 718 S.W.2d

at 247.

> The *Bruton* rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfessing co-defendant's Sixth Amendment right of confrontation. However, *Bruton* is not violated when the defendant confesses and his confession "interlocks" in material aspects with the confession of the co-defendant.

> Recognizing these general statements of applicable law, defendant insists that the recitals in Sexton's statement that "Terry [the defendant] said he wasn't going to let her [the victim] go, because he was afraid he would get in the same mess he got into with Lori" and that the defendant told him he had "choked" the victim before placing her in the trunk of the car and later removed her from the trunk and shot her while she was begging for him not to did not "interlock" with the defendant's confession to police.

> It is true defendant's confession to the police did not recite these facts, but his statement to Jerry Childress, also admitted in the trial, cured any material deficiency of the confession to the police. Childress testified that the defendant told him he killed the girl because "he had been in jail before, and

14

he wasn't going back to jail" and that he put the victim in the trunk of his car, later made her get out of the car and lie on the ground, and put the gun to her head and shot her after she begged him not to shoot and offered him money to let her go.

The inculpatory confessions of the defendant and co-defendant interlocking in the crucial facts of time, location, felonious activity, and awareness of the overall plan or scheme, we find no *Bruton* violation in the admission in evidence of the confessions. *See Parker v. Randolph, supra*. The confessions being admissible, it cannot be said that the trial court erred in failing to grant a severance of the defendants pursuant to Rule 14(c) of the Tennessee Rules of Criminal Procedure.

*Id*. (quoting *Parker v. Randolph*, 442 U.S. at 75) (other internal citations omitted).

Subsequent to the decision of the Tennessee Supreme Court on direct appeal, *Parker v. Randolph* was abrogated by the Supreme Court's decision in *Cruz v. New York*, 481 U.S. 186 (1987). In *Cruz*, the Supreme Court expanded *Bruton* and held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." *Id*. at 193 (internal citation omitted). The Court specifically found an "interlocking" confession to be especially problematic and thus inadmissible. *Id*. at 192-93. Nevertheless, the Court noted that a *Bruton* violation still could be considered harmless under the standard in *Harrington v. California*. *Id*. at 194.

In post-conviction proceedings, King again raised the *Bruton* issue in light of the intervening *Cruz* decision, which he argued should be applied retroactively. The Tennessee Court of Criminal Appeals declined to decide whether *Cruz* should be retroactive, noting that

15

"[e]ven if it were, *Cruz* provides for a harmless error analysis where a codefendant's confession is admitted in violation of the Confrontation Clause." *King v. State*, 1997 WL 416389 at *7. The appellate court then found that the admission of Sexton's statement was harmless error "in light of the overwhelming evidence of [King's] guilt of felony murder." *Id*. at *9.

The Tennessee Supreme Court affirmed, stating "We are confident that even under the principles of *Cruz*, the admission of Mr. Sexton's confession was harmless beyond a reasonable doubt." *King v. State*, 989 S.W.2d at 329 (citing *Schneble v. Florida*, 405 U.S. 427, 432 (1972); *Harrington v. California*, 395 U.S. 250, 254 (1969); *State v. Porterfield*, 746 S.W.2d 441, 446 (Tenn.), *cert. denied*, 486 U.S. 1017 (1988)). In doing so, the court first recited and compared the confessions of King and Sexton:

> Mr. Sexton's written confession described his involvement in the killing from the time the appellant arrived at his residence with Ms. Smith locked in the trunk of her own car. In his confession, Mr. Sexton stated that the appellant was not going to release Ms. Smith because he was afraid "he would get in the same mess he got into with Lori [Eastman Carter]." Mr. Sexton admitted that the appellant took his high-powered rifle and that the two men drove separately out to a rural area in Knox County.

> Before reaching their destination, both Mr. Sexton's vehicle and the vehicle driven by the appellant ran out of gasoline. In his confession, Mr. Sexton stated that he purchased five (5) dollars of gasoline for his car and five (5) dollars of gasoline in a separate container for Ms. Smith's car. The two men then drove a few miles up the road to a wooded area where the shooting was to occur. Mr. Sexton's confession describes in pertinent part:

> > I left and took a funnel back to the Publix station and got me a Coke. I drove back down to the creek and drove into the wooded area. I saw the Camaro. It was stuck. I helped [the appellant] get it unstuck. Terry told me he had already killed the girl. Terry

16

told me he laid the girl down on her stomach, and that while she
was begging for him not to, he shot her in the back of the head.
Terry told me he had covered the body up with some weeds.

Having carefully reviewed the written confessions made by the
appellant and Mr. Sexton, we again note that they are substantially similar as
to the facts and circumstances involving the murder. The appellant's
confession, however, contains greater detail concerning the actual shooting.
His confession provides in pertinent part:

I pulled up in a wooded area and got stuck. I made the girl get
out of the trunk. I had loaded the rifle and was pointing it at her.
This [sic] was daylight. And I took the girl over into some
weeds and made her lay down. She asked me what I was going
to do, if I was going to kill her. I said, no, some more guys are
going to screw you. I started covering her up with weeds. I told
her this was so she couldn't be seen. I still had the gun. She was
laying facedown. I picked up the rifle, held it approximately 3
feet from the back her head and shot her. [Mr. Sexton] wasn't
there. We got the [victim's car] unstuck after [Mr. Sexton] came
back. We then went through her personal belongings. I burned
her pictures and I.D. and panties. [Mr. Sexton] walked over and
looked at her. We started to leave, but decided to bury her. We
started digging a grave next to the fence, but the ground was too
hard, and we quit. We discussed what to do and decided to wrap
her in a tent [Mr. Sexton] had in the back of his car, [sic] weight
her and put her in the water. We decided we would do it the next
morning.

*Id*.

The court then noted that, although "the admission of Mr. Sexton's confession into

evidence would have constituted a *Bruton* violation" under *Cruz*, "the mere finding of a

violation of the *Bruton* rule in the course of the trial, however, does not automatically require

reversal of the ensuing criminal conviction." *Id*. (quoting *Schneble v. Florida*, 405 U.S. at

430). The court further noted that a *Bruton* violation may constitute harmless error "[i]n

17

cases where the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison." *Id*. at 329-30. The court then summarized the additional evidence against King.

> In this case, the objective evidence against the appellant was overwhelming. Jerry Childers, an acquaintance of the appellant, testified that the appellant came to his house on August 1, 1983, to inquire if he knew anyone who wanted to buy parts from a 1979 Camaro. Mr. Childers testified that the appellant confessed to having killed the woman who owned the Camaro after she threatened to charge him with rape. The appellant told Mr. Childers that he ordered the woman to get out of the trunk of her own car and to lie face down on the ground. The woman begged the appellant not to shoot her and offered him money. The appellant told Mr. Childers that he told the woman to turn away from him, and when she complied, he shot her in the back of the head.

> Mr. Childers testified that a few days after talking to the appellant, he went to the location where appellant had said the shooting occurred. While walking in the area, he found an object with hair on it. He then gave the information he had to Detective Herman Johnson of the Knox County Sheriff's Department and to Agent David Davenport with the Tennessee Bureau of Investigation. The two officers met Mr. Childers at the professed shooting location and searched the area, finding pieces of bone, hair, and bloodstains. A later more thorough search revealed bullet fragments and additional bone fragments.

*Id*. at 330 (footnotes omitted).

In a footnote, the court recounted additional proof against King:

> Additional evidence was provided by Agent Davenport and Tommy Heflin, a firearms examiner for the T.B.I. Agent Davenport testified that after the appellant made a statement, appellant took him and other officers to the place where the Camaro was hidden and to where he had hidden the vehicle's license plate. Also, appellant showed the officers where the shooting occurred and where he and Mr. Sexton had submerged the body in the quarry. Mr. Heflin testified that, based upon his examination, at least two bullets had been fired from a rifle with the same firing characteristics as Mr. Sexton's rifle. He

18

further stated that the intact metal bullet jacket found at the scene had been fired from Mr. Sexton's rifle.

*Id*. n.17. The Tennessee Supreme Court thus concluded: "There is no question that the evidence of appellant's guilt was overwhelming even without consideration of the two written confessions. Considering the above evidence, coupled with appellant's properly admitted confession, any *Bruton* error was harmless beyond a reasonable doubt." *Id*.

King insists that the admission of Sexton's confession was not harmless because it was used by the State with regard to Carter's testimony to explain King's subsequent actions with regard to Mrs. Smith. As the State points out, however, King has never denied that he was the one who killed Mrs. Smith and in fact confessed to the killing.

This court has reviewed the entire record of King's trial; the factual findings of the Tennessee Supreme Court are supported in the record. Based upon the foregoing, this court concludes that the determination by the Tennessee Supreme Court that the admission of Sexton's statement was harmless beyond a reasonable doubt was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the Supreme Court in *Bruton*, *Harrington*, *Schneble*, and *Cruz*, given the overwhelming evidence against King. King is not entitled to relief on this claim.

> **B. The failure to grant a severance at the sentencing hearing deprived Mr. King of his federal right to due process because the sentencing scheme created an inherent and insurmountable antagonism between the co-defendants and required Sexton's counsel to become a private prosecutor against Mr. King and allowed Sexton's counsel to damage Mr. King in a fashion that would have been unavailable to the State had Mr. King received a separate trial.**

19

King claims that the penalty phase of the trial was dominated by an inherent, statutory set of antagonistic defenses between the co-defendants by which the only way Sexton could defend himself was to argue that King was more culpable. King refers to two of the four mitigating factors requested by Sexton, which directly and adversely implicated King: that Sexton was an accomplice in a murder committed by another person and his participation was relatively minor, and that Sexton acted under extreme duress or the substantial domination of another person. According to King, Sexton's attorney was thus required by necessity to lambast King from every conceivable quarter, including cross-examining the State's witnesses about King's actions, calling witnesses that were not called by the State in an effort to impeach King, cross-examining King himself, soliciting testimony from Sexton that King appeared normal and sober on the day of the murder, and openly disparaging King's defense in final argument.

The Tennessee Court of Criminal Appeals considered and rejected these arguments in post-conviction proceedings:

> The petitioner also complains that his due process rights were violated during the penalty phase of the trial by the trial court's refusal to sever the defendants. We first note that the petitioner has cited no cases finding a due process violation resulting from a joint sentencing hearing. We acknowledge, however, that such violations are theoretically possible where the failure to sever renders the proceeding fundamentally unfair so as to violate due process. The petitioner contends that the joint trial rendered the sentencing phase fundamentally unfair because Sexton presented as mitigation that he had participated as a minor accomplice in the murder committed by the petitioner, and that he had acted under extreme duress or the substantial domination of the petitioner.

It was undisputed at both phases of the trial that the petitioner had actually killed the victim. It was also undisputed that the murder had been accomplished with Sexton's gun. The only significant difference in proof at sentencing with respect to Sexton's participation in the murder was whose idea it was to kill the victim. Sexton claimed it was the petitioner's; the petitioner claimed that it was Sexton's. Sexton's testimony on this point was unequivocal. The petitioner's was far less definite. More damning than anything Sexton stated, however, was first, the petitioner's own confession that, as soon as the victim had asked why they had raped her, he "knew what she was going to do, and [he] knew what [he] was going to do." Second, the petitioner admitted during cross-examination that he had "probably" killed the victim because she had mentioned rape and he became scared. Sexton's proof in mitigation of his own guilt paled in comparison with these admissions by the petitioner and we therefore find that Sexton's testimony on this issue did not render the petitioner's sentencing hearing fundamentally unfair.

Nor was the hearing rendered fundamentally unfair by Sexton's testimony that the petitioner had appeared sober to him at the time the petitioner came and got him immediately prior to the murder. The petitioner testified about the quantity of drugs and alcohol which he had consumed prior to the murder, and Sexton did not dispute this testimony. The petitioner offered expert proof as to the likely effects of these substances upon him and Sexton did nothing to contest that testimony. In fact, Sexton admitted that, when he had first seen the petitioner at about 2:00 a.m. on the morning in question, he had appeared to be under the influence of something. While Sexton's testimony about the petitioner's demeanor at the time of the murder was prejudicial insofar as it undercut the petitioner's attempt to offer as mitigation that his capacity to appreciate the wrongfulness of his conduct was substantially impaired as a result of intoxication, we do not think it was so harmful as to render the sentencing hearing fundamentally unfair. The jury undoubtedly understood that each of these men was trying to save himself at the expense of the other, and evaluated their credibility accordingly.

We have further examined the record of the sentencing hearing with respect to the petitioner's allegations of "the extreme antagonism of [Sexton's] counsel" and that Sexton's counsel "hurt [the petitioner] in ways that would have been improper for the State prosecutor to try." Our examination reveals no due process violation. The trial court's refusal to sever the defendants did not render the sentencing hearing fundamentally unfair as to the petitioner. This issue is without merit.

*King v. State*, 1997 WL 416389 at **11-12 (internal citation and footnote omitted).

The factual findings of the Tennessee Court of Criminal Appeals are supported in the record. Based upon the foregoing, this court concludes that the determination by the appellate court that the failure to sever the defendants did not result in a fundamentally unfair sentencing hearing was neither contrary to, nor did it involve an unreasonable application of, federal law. *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("Mutually antagonistic defenses are not prejudicial *per se*.").

> A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance. To show enough prejudice to require severance, a defendant must establish "substantial prejudice," "undue prejudice," or "compelling prejudice."

> Generally, persons indicted together should be tried together. Where the same evidence is admissible against all defendants, a severance should not be granted. However, severance is not required if some evidence is admissible against some defendants and not others. A defendant is not entitled to severance because the proof is greater against a co-defendant. Nor is a defendant entitled to a severance because a co-defendant has a criminal record.

> Hostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately. Neither does a difference in trial strategies mandate separate trials. The burden is on defendants to show that an antagonistic defense would present a conflict "so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."

*United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992) (quoting *United States v. Davis*, 623 F.2d 188, 194-95 (1st Cir. 1980)) (citations omitted). King is not entitled to relief on this claim.

22

### C. Conclusion

King is not entitled to relief on his claims that the trial court's failure to grant a severance violated his constitutional rights either during the guilt phase or the penalty phase of the trial.

## II. The unconstitutional use of aggravating circumstances at the trial requires the entry of a life sentence or a new sentencing hearing.

### A. Introduction.

As previously noted, in imposing the death penalty as to King, the jury found the following aggravating factors:

> (1) the defendant was previously convicted of one or more felonies, other than the present charge, which involved the use of threat of violence to the person;

> (2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind;

> (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant or another; and

> (4) the murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any rape, robbery, larceny or kidnapping. The jury also found that there was no mitigating circumstance sufficiently substantial to outweigh the statutory aggravating circumstances found by the jury.

*State v. King*, 718 S.W.2d at 248 (internal citations to the Tennessee Code Annotated omitted).

**B.     Two of these four aggravating circumstances were invalid.**

King first claims that the felony-murder aggravator was improperly considered by the jury, in light of the subsequent decision of the Tennessee Supreme Court in *State v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992).   In post-conviction proceedings, the Tennessee Supreme Court agreed with him:  "It is now a well-known principle that when a defendant is convicted of first degree murder solely on the basis of felony murder, the use of the felony murder aggravating circumstance to support a death sentence, without more, fails to sufficiently narrow the class of death-eligible offenders."  *King v. State*, 989 S.W.2d 319, 323 (Tenn. 1999) (citing *Middlebrooks*).

Despite finding a *Middlebrooks* error, however, the court concluded the error was harmless in light of the remaining aggravating factors.

> Our examination of the record in accordance with the foregoing principles demonstrates that the use of the felony murder aggravator, if error, was harmless beyond a reasonable doubt. The remaining three aggravating circumstances were properly applied and strongly supported by the evidence. First, there is no dispute that the appellant has prior felonious convictions that involve violence or threat of violence to the person. In 1983, the appellant was convicted of felony murder and aggravating [sic] kidnapping based upon a criminal episode in Grainger County. Moreover, he was convicted of assault with intent to commit aggravated kidnapping for criminal conduct in Knox County that occurred only three days after the murder of Ms. Smith.

*Id*. at 325 (footnote and internal citation omitted).  In a footnote, the court noted that "under the law in effect at the time of this trial, a jury could have imposed a sentence of death upon finding only one aggravating circumstance beyond a reasonable doubt, so long as there were

24

no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance." *Id*. n.12 (citation omitted).

The determination by the Tennessee Supreme Court in this regard was based solely on state law, and thus was neither contrary to, nor did it involve an unreasonable application of, federal law. King is not entitled to relief on this claim.

King also contends that the trial court's instruction on the heinous, atrocious and cruel (HAC) aggravator, as set forth in Tenn. Code Ann. § 39-2-203(i)(5) (repealed), was unconstitutional. During the penalty phase of the trial, the court instructed the jury that it could consider the following aggravating circumstance: The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;[6] the court did not define the terms heinous, atrocious, or cruel. [Addendum 1, Transcript of the Trial, Vol. XIX, p. 946]. King claims this instruction was unconstitutionally vague and relies on *Maynard v. Cartwright*, 486 U.S. 356 (1988).

In *Maynard*, the Supreme Court held that the statutory aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," without more, was unconstitutionally vague because it failed to furnish guidance to the jury in choosing between death and a lesser penalty. *Id*. at 363-64. The Court noted with approval, however, that a

---

[6]Tennessee law now provides the following HAC aggravator: "The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(5).

state court could restrict the HAC aggravator to murders "in which torture or serious physical abuse is present." *Id.* at 365.

Prior to *Maynard*, the Tennessee Supreme Court had narrowed the HAC aggravator by setting forth definitions of heinous, atrocious, cruel, torture, and depravity of mind:

Our statute provides that it is *the murder* which must be *especially* heinous, atrocious, or cruel. The second clause of this statutory provision, *viz.*, "... in that it involved torture or depravity of mind," qualifies, limits and restricts the preceding words "especially heinous, atrocious or cruel." This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer.

"Torture" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

However, we hold that "depravity of mind" may, in some circumstances, be shown although torture, as hereinabove defined, did not occur. If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim. This is true because it is the murderer's state of mind at the time of the killing which must be shown to have been depraved.

Thus, mutilation of the dead body of the victim may be found to constitute depravity of mind, but only if the mutilation occurred so soon after the death of the victim that the inference may be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing. If the length of time intervening between the time of death of the victim and the time of mutilation of the body is so great that the inference cannot be fairly drawn that the murderer possessed the depravity of mind at the time the fatal blows were inflicted, then it cannot be said that the murder, itself, involved depravity of mind.

*State v. Williams*, 690 S.W.2d 517, 529-30 (Tenn. 1985)

The Sixth Circuit has found Tennessee's HAC aggravating circumstance to be impermissibly vague on its fact. *Houston v. Dutton*, 50 F.3d 381, 383, 387 (6th Cir. 1995). The problem is curable, however, with appropriately narrowing language in the jury instructions, *Coe v. Bell*, 161 F.3d 320, 335 (6th Cir. 1988), or through a narrowing construction of the statutory language by a reviewing court on appeal. *Bell v. Cone*, 543 U.S. 447, 455-60 (2005) (per curiam).

In *Bell v. Cone*, the Supreme Court reversed the Sixth Circuit's grant of habeas corpus relief and held that the Tennessee Supreme Court's affirmance on direct review of the imposition of the death penalty based upon the jury's finding of the HAC aggravator was not contrary to clearly established federal law. *Id*. at 460. In doing so, the Court reviewed prior cases in which the Tennessee Supreme Court had consistently applied the narrowed construction of the HAC aggravator in affirming death sentences. *Id*. at 456-67. The Court then held that the Tennessee Supreme Court is presumed to have applied a narrowing construction of the HAC aggravator in the present case "absent an affirmative indication to the contrary." *Id*. at 456. Any error in the instruction to the jury was thus cured. *Id*. at 455.

> In light of these holdings, we are satisfied that the State's aggravating circumstance, as construed by the Tennessee Supreme Court, ensured that there was a "principled basis" for distinguishing between those cases in which the death penalty was assessed and those cases in which it was not.
>
> In sum, even assuming that the Court of Appeals was correct to conclude that the State's statutory aggravating circumstance was facially vague, the court erred in presuming that the State Supreme Court failed to cure this vagueness by applying a narrowing construction on direct appeal. The

27

> state court did apply such a narrowing construction, and that construction
> satisfied constitutional demands by ensuring that respondent was not sentenced
> to death in an arbitrary or capricious manner.

*Id*. at 459-60 (quoting *Arave v. Creech*, 507 U.S. 463, 474 (1993)); *see also Sutton v. Bell*, ---

F.3d ---, 2011 WL 2207315 at *6 (6th Cir. 2011) ("The Tennessee Supreme Court reviewed

and affirmed the jury's finding of the [HAC] aggravator on direct appeal. Because there is

no "affirmative indication to the contrary, we must presume that it" applied its

well-established, and permissible, narrowing construction of the aggravator, thereby

"cur[ing] any error in the jury instruction.") (quoting *Bell v. Cone*, 543 U.S. at 453-56);

*Payne v. Bell* 418 F.3d 644, 657 (6th Cir. 2005) ("The Tennessee Supreme Court in this case

can be presumed to have applied a narrowing construction to the HAC aggravator in its

decision upholding Payne's [death] sentence.").

In King's case, the Tennessee Supreme Court on direct appeal found no error in the

failure of the trial court to define "torture." "The evidence in this case supports the

aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(5), as defined in *State v. Williams*,

690 S.W.2d 517, 532-33 (Tenn. 1985), as the defendant shot the victim in the head after she

begged for her life and offered the defendant money to let her go." *State v. King*, 718

S.W.2d at 249.

In post-conviction proceedings, King again raised the constitutionality of the HAC

aggravator. The Tennessee Court of Criminal Appeals found the issue had been previously

determined by the supreme court on direct review. Nevertheless, the court of criminal

appeals also observed the following:

28

Moreover, although not noted by the Supreme Court in the direct appeal of this case but made plain by the record, the petitioner had trapped the victim in the trunk of her own car for some thirty to forty-five minutes immediately prior to shooting her. We think this treatment of the victim constituted severe mental pain as contemplated by this aggravating circumstance. Accordingly, this aggravator was not applied unconstitutionally.

*King v. Sate*, 1997 WL 416389 at *5 (footnotes omitted).

The Tennessee Supreme Court on appeal in post-conviction proceedings reiterated its conclusions.

As the Court of Criminal Appeals noted, the evidence supports the jury's finding that the murder was especially heinous, atrocious, and cruel. The appellant kept Ms. Smith trapped in the trunk of her own car for at least forty-five (45) minutes before the shooting. After driving to the remote wooded area, the appellant ordered Ms. Smith to get out of the trunk and lie face down in the weeds. The appellant had the rifle in his possession and began placing brush on top of Ms. Smith. She begged him not to shoot her and offered money to spare her life. When she asked about her fate, the appellant responded that other guys were coming to have sexual intercourse with her.

The appellant ordered Ms. Smith to look away from him while she was lying in the weeds. He then shot her at close range in the back of the head. We agree with the courts below that the manner of Ms. Smith's death involved severe mental pain and anxiety as contemplated by the (i)(5) aggravator and as defined by this Court in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985).

*King v. State*, 989 S.W.2d at 326. The Tennessee Supreme Court clearly applied a narrowing construction to the HAC aggravator in upholding King's death sentence and thus cured any error in the jury instructions.

King alleges that the Tennessee Supreme Court's narrowing construction of the HAC aggravator to cure the jury's finding cannot stand in light of *Ring v. Arizona*, 536 U.S. 584 (2002). In *Ring*, the Court held that, pursuant to the Sixth Amendment, a jury, and not a

29

judge, is required to find the aggravating circumstance that makes a defendant eligible for the death penalty. *Id*. at 609. As the Supreme Court in *Bell v. Cone* court noted, however, *Ring* does not apply retroactively. 543 U.S. at 454 n.6 (citing *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004)).

### C. The third aggravating circumstance of "prior violent felony" was unconstitutionally applied in Mr. King's case.

King complains that the Tennessee death penalty statute allowed, as an aggravating circumstance to make him eligible for the death penalty, the use of offenses that were unadjudicated at the time of instant offense as well as offenses allegedly committed after the instant offense. He claims that this resulted in double jeopardy at sentencing, since the range of punishment was changed partially by the aggravating factor. King admits that this claim was not presented to the state courts but contends that his procedural default should be excused because he is actually innocent of the death penalty.

King relies on *Schlup v. Delo*, 513 U.S. 298 (1995). "'[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.'" *Id*. at 321 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). The doctrine of actual innocence also applies to eligibility for the death penalty. A federal court may review a capital defendant's procedurally defaulted claim if the petitioner can show by "clear and convincing evidence that but for constitutional error at his sentencing

hearing, no reasonable juror would have found him eligible for the death penalty" under state law. *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992).

In this case, the court has found that the HAC aggravator was constitutionally applied to King, *supra* at 25-30. In addition, the jury also found the aggravating circumstance that the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another. Clearly, King was eligible for the death penalty and thus is not actually innocent of the death penalty. There is accordingly no basis for excusing his procedural default on the claim that the third aggravating circumstance was unconstitutionally applied.

> **D.** **The "prior felony" aggravating circumstance and the one remaining aggravating circumstance failed to complete constitutionally mandated narrowing due to the introduction of improper evidence by the State.**

King contends that Ms. Carter's testimony, the admission of which the Tennessee Supreme Court found to be harmless error, 718 S.W.2d at 246-47, supplied the factual basis for the aggravating circumstance that the murder was committed for the purpose of avoiding, interfering, or preventing the lawful arrest or prosecution of the defendant or another. King also refers to the fact that the State conceded on direct appeal that it was error to admit evidence of his two prior juvenile armed robbery convictions, which the Tennessee Supreme Court found to be harmless error based upon the "undisputed" evidence of King's prior convictions of "murder in the first degree in the perpetration of an armed robbery, aggravated kidnapping, and an assault with intent to commit aggravated kidnapping." *Id*. at 249. King

argues that the foregoing admission of improper evidence, in light of the fact that two of the four aggravating circumstances were invalid, clouded the two remaining aggravating circumstances and cannot constitutionally support his death penalty.

As noted previously, the Tennessee Supreme Court found that use of the felony-murder aggravator was harmless error. There remain three valid aggravating circumstances, despite King's insistence otherwise. There is nothing in the record to suggest that the evidence which the Tennessee Supreme Court found to be harmless error tainted the jury's consideration of the three aggravating circumstances.

> **E.** **The "reweighing" and "harmless error analysis" conducted by the Tennessee courts are contrary to, or an unreasonable application of, federal constitutional law.**

King contends that the Tennessee Supreme Court conducted an improper harmless error analysis after finding that the felony-murder aggravator should not have been used. The Supreme Court in *Clemons v. Mississippi*, 494 U.S. 738 (1990), held that when a state appellate court has found that an aggravating factor was unconstitutional, the court may conduct a harmless-error review of the capital sentencing. *Id*. at 754. After finding that the felony-murder aggravator was improperly applied under *Middlebrooks*, the Tennessee Supreme Court in post-conviction proceedings determined the error was "harmless beyond a reasonable doubt" in light of the "remaining three aggravating circumstances [which] were properly applied and strongly supported by the evidence." *King v. State*, 989 .W.2d at 325.

The court specifically stated as follows:

> After our independent review of the record, we are confident that the weighing of the mitigating evidence against the three remaining aggravators would have resulted in the same sentence of death. Accordingly, we conclude that appellant's sentence of death would have been the same had the jury given no weight or consideration to the felony murder aggravator and affirm the capital sentence.

*Id.* at 327. The findings of the Tennessee Supreme Court are supported in the record and its conclusions are neither contrary to, nor did they involve an unreasonable application of, federal law. *See Stringer v. Black*, 503 U.S. 222, 230-31 (1992) (a state appellate court may affirm a death sentence "after the sentencer was instructed to consider an invalid factor" if the appellate court "determine[s] that the sentence would have been the same had the [sentencer] given no weight to the invalid factor"); *Chapman v. California*, 386 U.S. 18, 24 (1967) (a constitutional error discovered on direct review may be held harmless only if it is "harmless beyond a reasonable doubt").

King also challenges the Tennessee Supreme Court's refusal to conduct a cumulative-error review. This claim lacks merit. As noted, the Supreme Court has held that a state court may uphold a death sentence that was "based in part on an invalid or improperly defined aggravating circumstance" if the court conducts a "harmless-error review." *Clemons v. Mississippi*, 494 U.S. at 741. The Tennessee Supreme Court did so. "Having determined that any sentencing error is harmless beyond a reasonable doubt, we again conclude that appellant's sentence of death should stand." *King v. State*, 989 S.W.2d at 328.

### III. Terry King's original trial counsel and appellate counsel were ineffective as a matter of federal constitutional law.

33

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), King must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id.* at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

The issue is whether counsel's performance "was so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222,

229 (6th Cir. 1992) (*en banc*). In addition, the court should not focus only upon "outcome

determination.

> Thus, an analysis focusing solely on mere outcome determination, without
> attention to whether the result of the proceeding was fundamentally unfair or
> unreliable, is defective. To set aside a conviction or sentence solely because
> the outcome would have been different but for counsel's error may grant the
> defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993).

This court has reviewed the entire record of King's post-conviction proceedings. The

factual findings of the state courts set forth below are supported in the record. In addition,

both the Tennessee Court of Criminal Appeals and Tennessee Supreme Court noted that the

standard for evaluating claims of ineffective assistance of counsel was established in

*Strickland v. Washington*. *King v. State*, 1997 S.W. 2d 416389 at *12, 989 S.W.2d at 330,

respectively. With the foregoing principles in mind, the court will consider King's claims of

ineffective assistance of counsel.

### A.    The failure of trial counsel to develop a theory of defense; the error in promising a defense of voluntary intoxication during the opening statement and then abandoning that defense in front of the jury.

King alleges that his attorney never developed a consistent theory of defense for the

guilt phase of the trial, and further abandoned a defense of voluntary intoxication that was

promised to the jury during opening arguments. According to King, it was constitutionally

ineffective assistance of counsel to promise the jury during opening statements that a defense

35

would be presented and then fail to call available witnesses to establish that defense.

Defense counsel made the following opening statement:

> Ladies and gentlemen of the jury, significant elements of this case have been ignored by the State in its opening statement. And you will hear about Diana Kay Smith was at Cherokee Dam. She was drinking. She was met by Mr. King. She was met by Mr. King's cousin, Mr. Don King, who we believe will testify, and that she voluntarily went to the trailer of Mr. Don King. That they consumed alcohol, LSD. Both Mr. Terry King and Mrs. Smith.

> That several other people came to the trailer, young males. That she engaged in consensual sex acts with these men. That Mr. King had been drinking all day, starting at about 10 o'clock in the morning, drinking beer. He consumed in excess of one case of beer, and a case of beer is twenty-four beers. That he had at least three separate tablets of LSD, three quaaludes during the course of that day. And Mrs. Smith had drank a considerable amount of wine, perhaps liquor as well, and took LSD.

> The proof will show that Mr. King was extremely intoxicated throughout the course of the events of July 31st, 1983, through the early morning hours and into the daylight hours of August 1st, 1983.

> We think the proof will show that whatever happened to Mrs. Smith, Mr. King's involvement was the product of an incredible quantity of intoxicants. And we think the proof will show that he cannot be held legally responsible for all of his actions to the degree the State would ask you, simply because of the vast quantities of intoxicants that he consumed. And the proof is going to be very clear on that point.

[Addendum 1, Transcript of the Trial, Vol. IX, pp. 9-10].

During closing argument, defense counsel stated "The effects of the drugs upon Terry? We don't know." [*Id.*, Vol. XIII, p. 400]. Counsel also stated "Now, whether his conduct was caused by drugs or some other reason, we don't know." [*Id.*, Vol. XIX, p. 401]. As part of his claim that defense counsel abandoned the theory of voluntary intoxication,

King alleges his attorney erred in failing to call as a witness Don King, whom counsel had stated in his opening argument would probably testify, to establish King's intoxication.

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

In support of his claim, the petitioner first complains that his trial counsel "abandoned" the defense theory of voluntary intoxication after having introduced it during opening statement. During the guilt phase of the trial, proof of the petitioner's consumption of alcohol and drugs came in through Childress' testimony and the petitioner's confession. Defense counsel did not call Don King, with whom the petitioner and the victim had spent the afternoon and evening, until the sentencing phase. King then testified that, beginning in the morning of July 31, 1984, the petitioner had drunk over a case of beer and had taken two "hits" of acid with the victim. He further testified that the petitioner had been "messed up worse than what I'd ever seen him." Also called by defense counsel during the penalty phase was Dr. Robert Booher, a physician who specialized in addictionology. Dr. Booher testified that LSD "greatly impairs a person's judgment" and that its "behavioral effects can last, usually, around eight to twelve hours." He also testified that Quaaludes cause "a marked impairment in judgment" and that it takes up to twenty-four to thirty-six hours for them to be eliminated from the body. According to Dr. Booher, alcohol also "impairs a person's judgment" and when alcohol and Quaaludes are combined, "the effects of each more than double each other." He further testified that Quaaludes will inhibit the body's ability to eliminate alcohol. On cross-examination, Dr. Booher testified that he had never examined the petitioner, that he had no way of knowing the amounts of LSD and/or Quaaludes the petitioner had taken without testing the actual substances which he had ingested, and that a person who takes these drugs over a long period of time develops a tolerance to their effects. The petitioner contends that defense counsel erred by not putting on this proof during the guilt phase of the trial so as to require the trial court to give an instruction on voluntary intoxication.

The trial court refused defense counsel's request for an instruction on voluntary intoxication on the basis of *Harrell v. State*, 593 S.W.2d 664 (Tenn.Crim.App.1979). In *Harrell*, this Court stated,

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime [such as premeditated murder] nor does it entitle an accused to jury instructions...; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent.... The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

593 S.W.2d at 672. Of course, in the instant case, the only witnesses who could have testified about the petitioner's state of mind at the time he committed the murder were the petitioner himself, Sexton, and the victim. While King's testimony might have been helpful as to the amount of drugs and alcohol he observed the petitioner ingest during the day and evening of July 31, 1984, the murder was not committed until after daylight had begun on the next morning. Don King's testimony, even combined with Dr. Booher's, was simply not sufficient in and of itself to establish the petitioner's state of mind as of the time he murdered the victim. And the petitioner's own statement to the police contains evidence that his state of mind was not so intoxicated as to require the jury instruction. His confession includes a very detailed recounting of the murder and the events leading up to it, indicating a clear memory; it indicates that he formed an intent to keep the victim from accusing him of rape; that he was able to drive a vehicle and load, point and fire a gun, indicating some level of motor skills; and that he had the presence of mind to go through the victim's personal belongings and burn her pictures and identification after murdering her. The proof available to the petitioner in this case was simply not sufficient to require a jury instruction on voluntary intoxication. Accordingly, defense counsel did not err by failing to pursue this "defense" more vigorously. This issue is without merit.

*King v. State*, 1997 WL 416389 at *12 (footnotes omitted). The court further noted that "[w]hile defense counsel may have erred in raising the possibility of this defense during opening statement, the petitioner has failed to prove that this tactic probably affected the jury's verdict." *Id*. n.14.

The Tennessee Supreme Court agreed that King's counsel was not ineffective in failing to pursue the voluntary intoxication defense. The court first noted that defense

38

counsel testified at the post-conviction evidentiary hearing "that he did not call Don King to testify at the guilt phase because he strategized that Don King's testimony would hurt the defense." *King v. State*, 989 S.W.2d at 331 (footnote omitted). This presumably was because King had admitted his guilt to Don King. *Id*. n.19. The court further noted that defense counsel testified at the post-conviction evidentiary hearing "that Ms. Carter's testimony was unexpected and devastating to [King's] case" and "that the theory of voluntary intoxication was rendered futile after Ms. Carter's testimony. Counsel decided to challenge Ms. Carter's credibility during the guilt phase of trial and to rely on the evidence of intoxication during the sentencing." *Id*. The court concluded:

> Although we acknowledge that defense attorneys should strive to present a consistent theory of defense at trial, we must avoid judging the tactical decisions of counsel in hindsight. We have reviewed the circumstances from counsel's perspective at the time and conclude that the change in strategy does not rise to the level of ineffective assistance.

*Id*. at 331-32 (internal citations omitted).

King argues that the supreme court's finding that Ms. Carter's surprise testimony rendered futile the theory of voluntary intoxication is at odds with its finding on direct appeal that the admission of Ms. Carter's testimony was harmless error and "could not have affected in any way the results of the trial or the sentence imposed." *State v. King*, 718 S.W.2d at 247. This argument overlooks the fact that Ms. Carter's testimony was harmless given the overwhelming evidence of felony murder that was properly admitted against King. That the surprise testimony of Ms. Carter altered the decision-making of defense counsel does not, without more, make the admission of Ms. Carter's testimony harmful error. This is especially

39

true given the details of King's confession, which belie his claim that he was so intoxicated he should not be held responsible for his actions. As defense counsel testified during the post-conviction hearing,

> The testimony of Lori Eastman was, from our perspective, totally unexpected and very devastating. It really skewed how we were looking at this case. We dropped the idea, after that, of even raising intoxication in the hopes of getting a second-degree murder conviction, which we had viewed as slim, anyway, and just decided to proceed with it in the penalty phase and raise it there, because of her testimony, apparently when he was sober, of nearly beating her to death, the way she described it, with her hair rolled up in a car window, and asking her if she was dying, and what did it feel like, and he wanted to know, so he would know what the next woman he killed felt like.

[Addendum 3, Transcript of the Evidence, Vol. IV, p. 400 - Vol. V, p. 401]. The court also notes that it is not unusual for counsel to change strategy as the evidence comes in during a trial, particularly a criminal trial.

King also challenges the conclusion by the Tennessee Court of Criminal Appeals that the testimony of Don King was not sufficient to support the theory of voluntary intoxication. This also overlooks the fact that counsel determined that Don King's testimony would hurt King's defense and for that reason decided to not call him as a witness. As defense counsel testified during the post-conviction hearing, once the defense strategy changed during the guilt phase as a result of Ms. Carter's testimony, the defense "wanted out of that phase as quick as we could and focus the jury on our side of the case," which was "[f]actors in mitigation to avoid the death penalty." [*Id.*, Vol. V, p. 401].

Based upon the foregoing, this court concludes that the determination by the state courts that counsel was not ineffective in failing to pursue the voluntary intoxication defense

40

was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

### B.     The failure of trial counsel to seek the assistance of qualified mental health experts or mitigation experts for the penalty phase of the trial.

King alleges that, although counsel were aware of King's long history of abusing drugs and alcohol as well as a variety of other events in his life that affected his mental and emotional state, they waited until the eve of trial before contacting any mental health experts. According to King, counsel were waiting for his family to raise the funds to hire experts and were not aware of a statute that authorized experts at state expense. King further contends that testimony from a mental health expert was necessary to prove a number of statutory and non-statutory mitigating factors which were applicable to his case.

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

> The petitioner next complains that his trial counsel was ineffective in failing to seek evaluations from mental health experts in a timely fashion. Defense counsel acknowledged on cross-examination that his office had begun the process of locating mental health expertise on January 9, 1985. At this time, the trial was set to begin on January 21, 1985, but was subsequently postponed to January 23, 1985, due to weather. Defense counsel obtained the services of Dr. Martin Gebrow, a psychiatrist, as of January 15, 1985. Dr. Gebrow first examined the petitioner on January 23, 1985: the day the trial began. Dr. Gebrow s evaluation was such that defense counsel made a strategic decision not to call him as a witness. This decision was based on two things: first, that the petitioner had lied to Dr. Gebrow about the circumstances of the murder he committed, and second, that Dr. Gebrow had told defense counsel that the petitioner "was a person that just liked to hurt people."

41

Defense counsel admitted at the post-conviction hearing that, given the time frame, they were not able to seek a second opinion which may have been more helpful. The petitioner therefore makes much of the delay in seeking Dr. Gebrow's assistance. However, the petitioner has failed to prove that, had counsel begun the mental health evaluations earlier, a more favorable evaluation would have been obtained. Although the petitioner offered at the hearing the testimony of Dr. Pamela Auble, who evaluated the petitioner for the purposes of this proceeding, Dr. Auble's testimony does not establish that an earlier pretrial evaluation of the petitioner would have been to his benefit. For one thing, her evaluation of the petitioner occurred many years after the offenses and after many years of incarceration. Also, the petitioner was apparently more truthful with Dr. Auble than he was with Dr. Gebrow. Of course, this "honesty" occurred only after the petitioner had been convicted. Accordingly, to the extent that Dr. Auble's evaluation of the petitioner might have presented a more favorable picture of him, it is impossible for us to conclude whether this more favorable picture stems from the petitioner's varying degrees of veracity in speaking with these experts, the passage of time spent in prison, and/or the fact that one evaluation occurred before conviction, the other years afterward. Thus, it would be sheer speculation for us to conclude that defense counsel would have eventually obtained a more helpful expert opinion had they started the process months earlier. It is the petitioner's burden to prove that he was prejudiced by the alleged failures of his trial counsel, and he has failed to meet that burden on this issue. Accordingly, we find it to be without merit.

The petitioner further complains that defense counsel's delay in seeking mental health expertise resulted in less mitigation proof than should have been offered. The record belies this assertion. Proof of mitigation introduced at trial included the devastating loss of the petitioner's father at an early age, his frequent sniffing of gasoline fumes and use of alcohol and/or drugs beginning at an early age, his poor school and work performances, and the disastrous effects of drugs and alcohol on his thoughts and actions. Also introduced was evidence of the petitioner's remorse and his good behavior while jailed. Dr. Auble's testimony at the post-conviction hearing did not alter this portrait of the petitioner in a beneficial manner. She characterized the petitioner as "impulsive," "dependent, immature" and as someone who "took offense very easily" while drinking or under the influence of drugs and who "tends to misinterpret people's actions as hostile." She further testified that the victim's suggestion to the petitioner that she might file a rape charge

42

was a trigger for [the petitioner]. The reasons that it was a trigger-there are three reasons. One is that [the petitioner] has a lot of fears of rejection that began way back after his father died. She was rejecting him. He perceived this. Second, he has this old accusation of holding his sister-in-law down while she was being raped. He knows that it is possible that, if a woman does this-files a rape charge-that it will be very difficult for him, and he will spend time incarcerated.

Third, he has had this recent bad relationship with Lori-recent in terms of the time of this event. He does not expect women to be good to him. He expects them to accuse him of things. He expects to be rejected by them.

These three factors went together and triggered a great deal of anger in [the petitioner]. This is anger that he has had for many years. Ever since his father died probably is when it started. This overwhelmed him, and he could not cope effectively. You know, as we have talked about, [the petitioner] is impulsive. He has poor judgment and has difficulty handling, or planning, or dealing with stress.

Not only does this testimony not add anything beneficial to what was put into evidence during the sentencing phase, it supports the State's case on the aggravating factor for committing the offense to avoid prosecution. Accordingly, the petitioner has failed to demonstrate that he was prejudiced by his lawyer's failure to hire an expert like Dr. Auble at an earlier time.

*King v. State*, 1997 WL 416389 at **13-15 (footnotes omitted). The Tennessee Supreme Court reiterated the testimony recounted by the court of criminal appeals and agreed with its conclusion that "counsel were not ineffective on this issue." *King v. State*, 989 S.W.2d at 333.

The court has read the testimony of Dr. Auble, as well as the other evidence presented at the post-conviction hearing. Dr. Auble testified that King was impulsive, took offense easily, and interprets the actions of others as hostile. [Addendum 3, Transcript of the

43

Evidence, Vol. II, pp.113, 123]. And she testified as to Ms. Smith's threat of a rape charge as a trigger for King's conduct. [*Id*. at 146-47].

On cross-examination, the prosecutor challenged Dr. Auble's conclusion that King's conduct was "impulsive" and not the actions of a cold-blooded killer, given the fact that, once Ms. Smith mentioned rape, King knew what he was going to do, made Ms. Smith get into the trunk of the car, procured a gun and loaded it, drove to a wooded area where he made Ms. Smith get out of the car and lay in the weeds, shot her, and then attempted to hide the body, first by burying it and then throwing it in a quarry. [*Id*. at 150-59]. Dr. Auble also testified on cross-examination that King meets the criteria for "antisocial personality disorder" which is "a personality disorder which is characterized by criminal activity." [*Id*. at 170-71].

Defense counsel testified that he did not call Dr. Gebrow as a witness during the penalty phase for two reasons: (1) the lies that King told Dr. Gebrow regarding Ms. Smith's murder would have been "a dangerous impeachment tool" for the prosecution, and (2) Dr. Gebrow "said that Mr. King was a person that just liked to hurt people, and that is not the kind of witness you want in a death penalty case." [*Id*., Vol. IV, p. 387]. Based upon the foregoing, this court concludes that the determination by the state courts that counsel was not ineffective in failing to present during the penalty phase the testimony of mental health experts was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

      **C.**    **The failure of trial counsel to investigate the background of the victim and discover a prior false allegation of rape by the victim.**

44

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

> The petitioner also complains that his trial counsel was deficient in failing to investigate thoroughly the victim's past. Specifically, he asserts that counsel should have discovered certain public records concerning a prior rape allegation, later dismissed, apparently made by the victim against another man long before she met the petitioner. Defense counsel admitted that he had not discovered this item from the victim's past. However, we fail to see what good this information would have done the petitioner at trial, even had his lawyer stumbled across it. The victim's character was not a relevant issue at trial. The victim's past actions, of which the petitioner had no knowledge at the time he murdered her, were not a relevant issue at trial. Therefore, this "evidence" would not have been admissible at trial and the petitioner suffered no prejudice from his attorney's failure to discover it.

*King v. State*, 1997 WL 416389 at *15. The Tennessee Supreme Court agreed.

> Counsel Simpson testified at the post-conviction hearing that he investigated Ms. Smith's past and her involvement with the appellant before the killing. He stated that he did not rely heavily on Ms. Smith's past because he did not want the jury to focus on her as a victim. Counsel was aware that Ms. Smith had lived in McMinn County, but he had no information concerning her prior rape allegation.

> We agree with the Court of Criminal Appeals that the prior rape allegation would not have benefited [sic] the appellant at trial. If anything, the information would have strengthened the prosecution's evidence of motive against him. Moreover, Ms. Smith's character was not at issue, and there has been no showing that information of her prior rape allegation would have been admissible. Therefore, we cannot say that defense counsel were ineffective for failing to discover it.

*King v. State*, 989 S.W.2d at 333.

This court agrees with the conclusions of the state courts. Accordingly, this court concludes that the determination by the state courts that counsel was not ineffective in failing

to investigate the victim's background was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

> ### D. The failure of trial counsel to call Mr. Terry Lynn King as a witness at the hearing on the motion to suppress Mr. King's statement.

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

> The petitioner further complains about defense counsel's failure to call him to the witness stand during the suppression hearing. In response to being asked why he did not call the petitioner to the stand, defense counsel testified:
>
>> One, I knew Judge Jenkins wasn't going to believe a convicted felon with his record over the testimony of, at least, two officers. But what deterred us from putting [the petitioner] on the stand was you [referring to prosecutor Jolley], and Mr. Crabtree, and ... Judge Jenkins-that we did not want to expose [the petitioner] to your cross-examination. We were confident that you would exceed the scope of a suppression hearing in your cross-examination; that Judge Jenkins would allow you to do so, coupled with the fact that we were dealing with a young man that we knew was of below-average intelligence, and would not do well on cross-examination. And we were confident that, upon trial, even though it is not admissible, that some of that stuff that you would glean from a suppression hearing ... would come in at trial, and we didn't want you to go to school on [[the petitioner] as a witness. We wanted your first crack at him to be your only crack at him.
>
> As correctly noted by the court below, this was a "tactical decision" and one that was made with "adequate reasons." We will not now second-guess this strategy call with the benefit of twenty-twenty hindsight. This issue is without merit.

*King v. State*, 1997 WL 416389 at *16 (footnote and internal citation omitted). The Tennessee Supreme Court agreed.

As correctly noted by both the trial court and the Court of Criminal Appeals, counsel made a tactical decision not to call the appellant as a witness at the suppression hearing. We will not second guess that strategy on appeal with the benefit of twenty-twenty hindsight. Counsel made a calculated decision, and there has been no showing of ineffectiveness.

*King v. State*, 989 S.W.2d at 333-34 (internal citations omitted).

King contends that it was not reasonable for trial counsel to believe that the trial judge would not follow the law and would allow the prosecutors to use improperly obtained information at trial. Nevertheless, that was a call for trial counsel to make. This court agrees with the conclusions of the state courts and will not second guess defense counsel's trial strategy in this regard. Accordingly, this court concludes that the determination by the state courts that counsel was not ineffective in failing to call King as a witness at the suppression hearing was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

E(D).[7]    **The failure of trial counsel to ensure that all bench conferences were recorded and transcribed by the court reporter.**

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

The petitioner next points to his defense counsel's failure to preserve on the record all of the bench conferences which occurred during the trial. While we agree with the petitioner that all bench conferences should be preserved on

---

[7]This subpart was incorrectly designated in the amended habeas corpus petition as a second "D." and has been redesignated by the court as subpart "E." Subsequent subparts were likewise incorrectly designated and have been redesignated by the court in logical progression, with the original designation in parentheses.

47

the record, *see, e.g., State v. Hammons*, 737 S.W.2d 549, 551 (Tenn.Crim.App.1987), we disagree that "the lack of a transcript of these crucial conversations" is, *ipso facto*, prejudicial within the context of *Strickland*. In order to demonstrate prejudice on this issue, the petitioner must show at least a likelihood that one or more of the unrecorded bench conferences resulted in an adverse ruling that constituted reversible error. The petitioner has not done so. Indeed, the petitioner has conceded that "this factor taken by itself would not warrant reversal." This allegation is without merit.

*King v. State*, 1997 WL 416389 at *15. The Tennessee Supreme Court agreed.

The State concedes that counsels' failure to preserve all of the bench conferences was an instance of deficient performance. The State argues, however, that the appellant has not demonstrated any prejudice as a result of the deficiency. We agree. In order to demonstrate prejudice here, the appellant must show a reasonable probability that one or more of the unrecorded bench conferences resulted in an adverse ruling that constituted reversible error. The appellant has not satisfied that burden. Accordingly, this issue is without merit.

*King v. State*, 989 S.W.2d at 333.

King argues that the absence of any record of what was said at the bench conferences makes it impossible to make a showing of prejudice. Nevertheless, in order to demonstrate ineffective assistance of counsel, King must show some prejudice, which he has failed to do. Therefore, this court concludes that the determination by the state courts that King failed to demonstrate prejudice as to his claim that counsel was ineffective in failing to ensure that all bench conferences were recorded and transcribed was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

### F(E). The failure of trial counsel to object to the introduction of the suicide note.

Co-defendant Joe Sexton attempted suicide prior to trial and left a handwritten note which cleared King of Ms. Smith's murder. In fact, the note was fabricated with King's

48

knowledge and at his request. The State introduced the suicide note during the cross-examination of Sexton during the penalty phase. King claims trial counsel was ineffective in failing to object to the introduction of the note. He raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

> In his next allegation of ineffective assistance of counsel, the petitioner points to the penalty phase of his trial during which his counsel did not object upon introduction into evidence of a suicide note written by the petitioner's codefendant, Randall Joe Sexton. Sexton had written the note in contemplation of his suicide prior to trial. He testified that he had discussed the contents of the note with the petitioner prior to writing it, and that the petitioner had suggested he include a statement that he, Sexton, was responsible for the victim's death, not the petitioner. The note was found after Sexton attempted suicide and was taken to the hospital, and was used very effectively by the State to impeach Sexton's credibility. The petitioner's counsel subsequently relied on it in closing not only to argue that Sexton could not be believed, but to demonstrate that the petitioner had not tried to rely on this note for his defense, and admitted (during the penalty phase of the trial) to having killed the victim. In other words, defense counsel used it against Sexton and as a method of bolstering their own client's credibility and willingness to take responsibility for his own actions. This was a strategy call by defense counsel and one that we will not condemn.

*King v. State*, 1997 WL 416389 at *16. The Tennessee Supreme Court agreed.

> We agree with the Court of Criminal Appeals that counsel made a tactical decision to use the suicide letter, not only to attack Mr. Sexton's credibility, but to bolster the credibility of the appellant. Again, we decline to second guess the strategy chosen by defense counsel. Counsel knew about the suicide letter before trial and chose to use it during the sentencing phase to undermine the testimony of Mr. Sexton.

*King v. State*, 989 S.W.2d at 334.

King argues that the admission of the suicide note did not further King's interests and that it is difficult to conceive of a tactical reason to justify counsel's failure to object. This court, however, agrees with the appellate courts that this was trial strategy, which the court will not second-guess. Based upon the foregoing, this court concludes that the determination by the state courts that counsel was not ineffective in failing to object to the introduction of Sexton's suicide note was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

### G(F). The failure of appellate counsel to appeal the State's use of a dismissed juvenile allegation during the trial.

This claim refers to a question asked during the cross-examination of Gary E. King, petitioner King's brother, who testified on his behalf in the penalty phase of the trial.

Q      Mr. King, is it not correct, sir, that in January of 1979, more specifically January the 24th of 1979, that your wife, Donna J. King, accused Mr. Terry Lynn King, your brother, of assisting in her rape?

A      Yes, sir.

MR. TIPTON: We object to that, your Honor.

THE COURT: Overruled.

[Addendum 1, Transcript of the Trial, Vol. XV, p. 528]. Mr. King also admitted that he took his wife out of the jurisdiction so she would not be available to testify against petitioner King. [*Id*. at 529]. King contends that the admission of this evidence was in error because King was a juvenile at the time and because the warrant had been dismissed, and that counsel should have raised the error on direct appeal.

50

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

> The petitioner further alleges that defense counsel was ineffective for failing to appeal the State's use during the penalty phase of the trial of a charge that had been made against the petitioner while a juvenile and later dismissed. We remind the petitioner that

>> there is no constitutional requirement that an attorney argue every issue on appeal.... Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel.

>> ***

>> Moreover, the determination of which issues to raise on appeal can be characterized as tactical or strategical choices, which ... should not be 'second guessed' on appeal, subject, of course, to the requisite professional standards.

> When questioned in this case about how he had decided which issues to raise in the direct appeal, defense counsel testified, "You look at the proof as it was adduced at trial. You read your record as carefully as you can, bone up on the applicable case law as to the issues suggested; and the dogs that will hunt, you put in the brief, and the ones that won't, you leave home." Obviously, defense counsel decided that the admission of the juvenile charge in question "wouldn't hunt." We will not second-guess this strategy call.

*King v. State*, 1997 WL 416389 at *17 (quoting *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn.1993)) (footnote omitted).  The Tennessee Supreme Court agreed.

> This Court has previously held that there is no constitutional requirement for an attorney to raise every issue on appeal."Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." Counsel is given considerable leeway to decide which issues will serve the appellant best on appeal, and we should not second guess those decisions here.

51

Counsel Simpson testified that the defense carefully examined the trial record and listed every issue that might have merit on appeal. Counsel included a challenge on direct appeal to the State's use of the armed robbery convictions, and this Court held that admission to be harmless error. Under those circumstances, we cannot say that counsels' omission of the dismissed rape charge was ineffective.

*King v. State*, 989 S.W.2d at 334 (quoting *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993)) (internal citations omitted).

King contends that, in light of the fact that the Tennessee Supreme Court held that the use of King's juvenile convictions for armed robbery was harmless error, had counsel appealed the use of the dismissed juvenile charge the supreme court would have been faced with a more difficult question. This court disagrees with King and agrees with the state appellate courts that this was a matter within the discretion of counsel. Accordingly, this court concludes that the determination by the state courts that counsel was not ineffective in failing to appeal the use of the dismissed juvenile charge was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

### H(G). The failure of trial counsel to investigate the dismissed juvenile charge.

King claims that defense counsel correctly but foolishly assumed that a dismissed charge would not be admissible at trial and therefore failed to investigate the charge. According to King, counsel learned after the trial was over that the investigating officer did not believe Mrs. King's allegations and that one of the prosecutors at King's murder trial was the person who moved to have the juvenile charge dismissed.

52

King did not raise this claim in post-conviction proceedings. Accordingly, the claim has been procedurally defaulted.

> **I(H).** **It was ineffective assistance of appellate counsel to fail to file a petition for certiorari to the United States Supreme Court after appellate counsel promised to file such a petition and the petition would have been granted in light of the status of *Cruz v. New York*.**

Defense counsel admitted that he misread the rules as to filing a petition for certiorari and believed he had ninety days within which to file the petition, when in fact he had sixty days. When he realized his mistake, the sixty days had passed and any request for an extension of time had to have been filed during the original sixty-day period. [Addendum 3, Transcript of the Evidence, Vol. V, pp. 407-10].

King raised this issue in post-conviction proceedings, which was considered and rejected by the Tennessee Court of Criminal Appeals.

> The petitioner also alleges that one of his trial lawyer's representation was deficient because he failed to timely file a petition for writ of certiorari with the United States Supreme Court after having told the petitioner that he would do so. The State concedes that the attorney's failure in this regard was "an instance of deficient performance." Whether deficient or not, a lawyer's failure to file a petition for discretionary review does not constitute ineffective assistance of counsel. The United States Supreme Court has held that criminal defendants do not have a constitutional right to counsel to pursue applications for its review. It has further held that, because a defendant has no constitutional right to counsel to pursue applications for certiorari, he can't be deprived of the effective assistance of counsel by his counsel's failure to file the application timely. Accordingly, this allegation of ineffective assistance is without merit.

*King v. State*, 1997 WL 416389 at \*17 (citing, respectively, *Ross v. Moffitt*, 417 U.S. 600 (1974) and *Wainwright v. Torna*, 455 U.S. 586 (1982)). The Tennessee Supreme Court did not address this issue in its opinion.

King contends that had counsel filed the petition for certiorari, it almost certainly would have been granted because *Cruz v. New York* had been accepted for argument by the U.S. Supreme Court while King's direct appeal was pending before the Tennessee Supreme Court. Nevertheless, the Tennessee Court of Criminal Appeals was correct that a criminal defendant does not have a constitutional right to counsel "to file petitions for certiorari" in the Supreme Court, *Ross v. Moffitt*, 417 U.S. at 612, and thus a criminal defendant "could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely." *Wainwright v. Torna*, 455 U.S. at 587.

In any event, *Cruz* allows a court to conduct a harmless error analysis of a *Bruton* claim under the standard set forth in *Harrington v. California*. The Tennessee Supreme Court performed such a analysis. Based upon the foregoing, this court concludes that the determination by the Tennessee Court of Criminal Appeals that counsel was not ineffective in failing to timely file a petition for certiorari was neither contrary to, nor did it involve an unreasonable application of, federal law under *Strickland*.

### J(I). Conclusion

King claims that the individual and cumulative effect of counsel's errors denied him the effective assistance of counsel. The court has found that the state courts' findings on the individual claims that counsel was not ineffective were neither contrary to, nor did they

54

involve an unreasonable application of, federal law under *Strickland*. To the extent King

alleges he is entitled to relief under a cumulative error theory, this claim lacks merit. *See*

*Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) ("the accumulation of non-

errors cannot collectively amount to a violation of due process") (internal quotation marks

omitted).

> **IV.** **Mr. King's conviction and death sentence violate the doctrines of *Brady/Giglio* and deny Mr. King his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

King alleges the prosecution withheld exculpatory, mitigating, and/or impeachment

evidence in violation of his rights under *Brady* and *Giglio*. In *Brady v. Maryland*, 373 U.S.

83 (1963), the Supreme Court held "that suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

*Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the *Brady*

rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material,

and constitutional error results from its suppression by the government, 'if there is a

reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)

(quoting *Bagley*, 473 U.S. at 682).

"There are three components of a true *Brady* violation: The evidence at issue must

be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court considered a situation where the prosecution withheld from the jury the fact that it had promised a key witness that he would not be prosecuted for his part in a crime if he testified against his companion. Because the witness's credibility was a key issue, the Court found that the government's conduct violated due process and the defendant was entitled to a new trial. *Id.* at 154-55. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Id.* at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

In order to state a *Giglio* claim a petitioner must demonstrate "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). Furthermore, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id.*

King first alleges that the State withheld evidence demonstrating that there was only one bullet associated with Ms. Smith's murder. According to King, this is important because the prosecution told the jury that Ms. Smith was shot twice. King also claims that the prosecution urged the jury to find the HAC aggravating circumstance partially on the theory that the victim was shot not once, as King admitted, but twice. A review of the transcript of closing arguments during the penalty phase reveals, however, that neither prosecutor asked

56

the jury to base the HAC aggravating factor on the fact that Ms. Smith was shot twice nor did either prosecutor mention this fact. [Addendum 1, Transcript of the Trial, Vol. XVIII, p. 894-Vol. XIX, p. 904, pp. 941-45].

Agent David Davenport with the TBI testified that a bullet and bullet fragment were found at the crime scene where Ms. Smith was killed. [*Id.*, Vol. XI, p. 106]. Tommy Heflin, a firearms examiner with the TBI crime lab testified that at least two bullets were fired. [*Id.*, Vol. XI, p. 227]. King alleges that records recently obtained by current counsel from the TBI reveal that only one bullet was found at the crime scene and that Ms. Smith was shot one time. It appears from the record that there was some confusion as to whether the bullet fragment was recovered from the site where Todd Lee Millard's body was found or where Ms. Smith was killed. According to King, this is because one metal object was found where Ms. Smith was killed, two metal objects were found at Mr. Millard's grave site, and three metal objects were turned over to the TBI for testing.

The court does not find that King has shown a violation of either *Brady* or *Giglio* with respect to whether there was one bullet or two bullets. There is nothing in the record to suggest that the prosecution withheld exculpatory evidence or deliberately presented false evidence. In addition, given the overwhelming evidence against King including his admission that he shot Ms. Smith in the head with the intent to kill her, any alleged violation is not material because it would not have altered the outcome of the proceedings.

King also alleges that the prosecution withheld evidence that would have impeached the testimony of Lori Eastman Carter. According to King, although Ms. Carter testified at

trial that King beat her to the point of unconsciousness, recently discovered photographs taken of Ms. Carter immediately after the incident show that Ms. Carter had no injuries other than a bruised eye. [Court File No. 95, Notice of Filing, Attachment I to Amended Habeas Petition]. In addition, King claims that the hospital report from her visit that evening describe her as "drinking/incoherent/states she was beaten up." [Attachment G to Amended Habeas Corpus Petition].[8]

King contends that had defense counsel been provided the photographs of Ms. Carter, it would have been likely that the trial judge would have excluded her testimony. Even if the testimony had not been excluded, King argues that Ms. Carter could have been impeached by the photographs.

The trial court allowed the testimony of Ms. Carter over defense counsel's strenuous objection, finding the testimony "material on the issues of premeditation, motive, intent, and malice." [Addendum 1, Transcript of the Trial, Vol. XII, p. 276]. The court further found that "the probative force of the evidence outweighs the potential for unfair prejudice." [*Id*. at 276-77].

Ms. Carter testified that on October 13, 1982, while at her car in the parking lot of the Foxy Lady Lounge on Merchants Drive, King hit her causing her to lose consciousness;

---

[8]King also claims that, although the incidence took place on August 12, 1982, Ms. Carter waited two months, until October 13, 1982, to take out a misdemeanor warrant against King for assault and battery. There is nothing in the record, however, to show that the incident took place on August 12, 1982, and the record in fact contradicts this claim. The handwritten statement of Ms. Carter and the warrant she swore out on October 13, 1982, state that the incident occurred on October 12, 1982. [Addendum 1, Transcript of Trial, Vol. XXI, Exhibits 66 and 67, pp. 1099 and 1100, respectively].

when she regained consciousness, she was in the floorboard of her car and King was driving the car. [*Id*. at 278-79]. Ms. Carter further testified that King subsequently stopped the car, pulled her from the floorboard by her hair, rolled her hair up in the car window, and continued to beat her around her face and neck. [*Id*. at 279]. Ms. Carter also testified as follows:

> Several times he said that he wanted me to tell him – he asked me if I knew that I was dying, and I said yes. And he wanted me to tell him how it felt to be dying, so that the next woman he killed he would know how she felt.

[*Id*.].

Finally, Ms. Carter testified that she again lost consciousness and when she regained consciousness she heard King telling his cousin James King that he, King, had killed her and needed help in putting her in the quarry and burning her car. [*Id*. at 279-80]. After Ms. Carter's testimony, the court instructed the jury that "with regard to the testimony of Lori Eastman Carter, I instruct you that you are to consider the evidence of the incident which she testified to only in regard to the issues of premeditation, motive, intent, and malice in the case that we are trying now and for no other purpose." [*Id*. at 294].

James King, who testified on behalf of King during the guilt phase of the trial, admitted that he saw King with Ms. Carter on October 12 or 13, 1982, but denied that King told him he had killed her. [*Id*., Vol. XIII, p. 324]. James King testified that King asked him to follow him to St. Mary's Hospital because Ms. Carter was sick. [*Id*.]. On cross-examination, James King testified that when he looked in the car, Ms. Carter was half in the seat and half in the floorboard, but he did not look at her face and thus did not see any

59

bruises. [*Id*. at 326]. He also testified that the interior of the car smelled very bad. [*Id*.]. On redirect, he testified that the smell was like someone had been drinking a lot of alcohol and had regurgitated the alcohol. [*Id*. at 330].

In support of his claim, King has attached the affidavit of Michael R. Chavis, an investigator for the Federal Defender Services of Eastern Tennessee, Inc., which represents King in this proceeding. [Attachment F to Amended Habeas Corpus Petition]. Mr. Chavis testifies that he interviewed Ms. Carter at her residence; she stated that King beat her unconscious and pulled out patches of her hair when he rolled it up in a car window, and that she took photographs to document the injuries. [*Id*.]. According to King, the photographs do not show patches of her hair missing. This argument overlooks the fact that Ms. Carter did not testify at trial that patches of her hair were pulled out.

Based upon the foregoing, the court finds that King has not shown a violation of either *Brady* or *Giglio* with respect to the pictures of Ms. Carter or the hospital report. The pictures show that Ms. Carter was assaulted, which was consistent with her testimony, and she was taken to the hospital where she was treated for her injuries. The hospital report does refer to the fact that Ms. Carter had been drinking, but that was testified to by James King. In any event, the fact that Ms. Carter may have been drinking is not relevant to her allegation of assault.

> **V.     Mr. King was denied due process and his right to trial by jury when the trial court refused to instruct the jury on second degree murder and voluntary intoxication.**

60

King alleges that, since the jury did not find him guilty of first degree premeditated murder but rather guilty of felony murder, the jury determined that he should be found guilty of some form of murder. According to King, the evidence of his intoxication must have been sufficient to prevent the jury from finding him guilty of first degree premeditated murder and thus felony murder was the only option left. King therefore argues that had the jury been instructed on second degree murder, they could have found him guilty on that lesser offense.

### A. The proof of intoxication and passion.

King contends that the State's own evidence during its case in chief, including King's statement, showed that King had ingested an extraordinary quantity of mind-altering drugs. King also contends that the evidence showed that he acted in a state of extreme passion at the possibility that he would be unjustly accused of rape.

### B. The right to have the jury fully instructed on the law.

King relies on *Beck v. Alabama*, 447 U.S. 625 (1980), for the proposition that an accused in a capital case has a constitutional right to a jury instruction on lesser included offenses. In *Beck*, the Supreme Court was faced with a state law which prohibited the trial judge in a death penalty case from giving the jury the option of conviction on a lesser included offense -- the jury was required to either convict the defendant of the capital crime and impose the death penalty, or acquit him; if convicted the trial judge was to then consider aggravating and mitigating circumstances, and then refuse to impose the death sentence if it was not warranted and instead sentence the defendant to life in prison. *Id*. at 627-29. The Court considered the question "May a sentence of death constitutionally be imposed after a

61

jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?" and held it could not. *Id.* at 627.

In doing so, the Court observed:

> While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-but leaves some doubt with respect to an element that would justify conviction of a capital offense-the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments:

>> [D]eath is a different kind of punishment from any other which may be imposed in this country. . . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

> To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case.

*Id.* at 637-38 (quoting *Gardner v. Florida*, 430 U.S. 349, 358-58 (1977)) (footnotes omitted).

The *Beck* Court thus invalidated a state statute that *prohibited* a trial judge from instructing a jury on lesser included offenses. Contrary to King's contention, the Court did not hold that the due process clause always requires giving a instruction on a lesser included offense. In fact, in *Hopper v. Evans*, 456 U.S. 605, 611 (1982), the Court ruled that a capital defendant is entitled to a lesser included offense instruction "*only* when the evidence warrants such an instruction." Thus the *Hopper* Court concluded that no lesser included offense instruction was required where "[t]he evidence not only supported the claim that the defendant intended to kill the victim, but affirmatively negated any claim that he did not intend to kill the victim." *Id.* at 613.

## C. Under these facts, the trial court deprived Mr. King of due process.

On direct appeal, King complained of the trial court's failure to charge the jury on second degree murder. In post-conviction proceedings, he again raised that issue as well as his claim that the trial court should have instructed the jury on voluntary intoxication.

The Tennessee Supreme Court on direct appeal rejected the claim that the jury should have been instructed on second degree murder.

> The record shows that defendant was indicted for both common law murder and two counts of felony murder, and all counts were submitted to the jury for decision. Anytime a court instructs a jury in a homicide case, he should instruct all lesser included offenses and in most instances it is error not to do so. But where the evidence clearly shows that defendant was guilty of the greater offense, it is not error to fail to charge on a lesser included offense. In this case the record of the guilt phase of the trial is devoid of any evidence which would permit an inference of guilt of second-degree murder or the other

63

> lesser included offenses. The State's proof of premeditation and deliberation, and the fact that the killing occurred during the commission of a felony, which includes the defendant's confessions to Childers and to the police, was uncontradicted. Consequently, we find no prejudicial error in the trial judge's refusal to instruct the jury on the elements of murder in the second degree.

*State v. King*, 718 S.W.2d at 245 (internal citations omitted).

The Tennessee Court of Criminal Appeals in post-conviction proceedings thus concluded that the issue of whether second degree murder should have been presented to the jury had been previously determined and the court thus refused to reconsider it. *King v. State*, 1997 WL 416389 at *17. The appellate court also found that King had waived his claim that the trial court should have given an instruction on voluntary intoxication by failing to raise the claim on direct appeal. *Id.*

The court first notes that, although King now claims that the failure to instruct the jury on the lesser-included offense of second degree murder violated his rights under both federal and state law, in his brief on direct appeal King raised this issue solely as a matter of state law. [Addendum 2, Document A, Brief of Appellant, pp. 53-55]. The Tennessee Court of Criminal Appeals likewise considered the issue solely as a matter of state law. *State v. King*, 718 S.W.2d at 244. Accordingly, by failing to raise this claim as a matter of federal constitutional law, King has procedurally defaulted his claim that the trial court should have instructed the jury on lesser included offense of second degree murder. *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (in order to exhaust state remedies as to a particular claim, that claim must have been presented to the state courts as a federal constitutional claim).

64

In any event, the court finds that King would not be entitled to relief on this claim. As the Tennessee Supreme Court found, the evidence adduced at trial clearly militated against an instruction on second degree murder or other lesser included offenses. Thus, the conclusion of the Tennessee Supreme Court was neither contrary to, nor did it involve an unreasonable application of, federal law under *Beck v. Alabama* and *Hopper v. Evans*.

With respect to his claim that the trial court should have instructed the jury on the defense of voluntary intoxication, the Tennessee Court of Appeals found that King waived that issue by failing to raise it on direct appeal. That being so, King has procedurally defaulted the claim in this court. King contends that his default should be excused because his attorney rendered ineffective assistance of counsel by failing to pursue the issue on direct appeal. King did not raise such a claim of ineffective assistance of counsel in post-conviction proceedings and thus cannot rely on it in these proceedings. [Addendum 4, Doc. A, Brief of the Appellant, pp. 75-107].

> **VI.    The "reasonable doubt" instructions given in the case violated Mr. King's right to due process because the use of the phrases "moral certainty" and "let the mind rest easy" denigrate the high standard of proof required to sustain a criminal conviction.**

> **A.    Reasonable doubt instructions given in *State v. King*.**

The trial court gave the following reasonable doubt instruction during the guilt phase:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. In order to convict a defendant of any criminal charge, every element of proof required to constitute the offense must be

65

proven to a moral certainty, but absolute certainty of guilt is not demanded by the law.

[Addendum 1, Transcript of the Trial, Vol. XIV, pp. 444-45].

During the penalty phase, the court gave the following instruction:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of your findings. You are the sole and exclusive judges of the credibility of the witnesses and the weight to be given to the evidence presented.

[*Id.*, Vol. XIX, p. 949].

> **B.**   *Cage v. Louisiana* **and its progeny.**
>
> **C.**   *Rickman v. Dutton* **and the Tennessee Reasonable Doubt Instruction.**

King alleges that the trial court's instruction to the jury on reasonable doubt violated his right to due process. The Tennessee Court of Criminal Appeals found that this issue had been waived because it "was not raised in the petitioner's motion for new trial or on direct appeal." *King v. State*, 1997 WL 417389 at *18. Accordingly, King as procedurally defaulted this claim. In any event, King would not be entitled to relief.

In *Rickman v. Dutton*, 864 F. Supp. 686 (M.D. Tenn. 1994), *aff'd*, 131 F.3d 1150 (6th Cir. 1997), U.S. District Judge John T. Nixon granted the petitioner a writ of habeas corpus on five grounds: (1) the petitioner's attorney rendered ineffective assistance of counsel during the guilt phase of the trial, (2) the perjured testimony of a prosecution witness was not harmless beyond a reasonable doubt, (3) the jury instruction on reasonable doubt misstated the burden of proof, (4) petitioner's due process rights were violated by the involuntary

administration of sedatives and depressants to him, and (5) the cumulative effect of the errors in the case violated due process.

With respect to the reasonable doubt jury charge, Judge Nixon found the following charge constitutionally defective:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

864 F. Supp. at 708. Judge Nixon relied on *Cage v. Louisiana*, 498 U.S. 39 (1991), in which the Supreme Court found that a jury instruction stating what was required was a "moral certainty" rather than an "evidentiary certainty" allowed a reasonable juror to find guilt based on a lower standard of proof. *Id*. at 40-41. Judge Nixon noted, however, the decision in *Victor v. Nebraska*, 511 U.S. 1 (1994), wherein the Supreme Court held that the term "moral certainty" does not, of itself, render a reasonable doubt instruction unconstitutional so long as the rest of the instruction "lends content to the phrase." *Id*. at 14-16.

In affirming Judge's Nixon's decision in *Rickman*, the Sixth Circuit resolved the appeal on the sole issue of ineffective assistance of counsel and thus declined to address the remaining issues, including the constitutionality of the reasonable doubt instruction. *Rickman v. Bell*, 131 F.3d at 1152. Nevertheless, in *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997), *cert. denied*, 523 U.S. 1088 (1998), the Sixth Circuit held constitutional the same reasonable doubt jury instruction that Judge Nixon in *Rickman* found to be unconstitutional.

67

In doing so, the Sixth Circuit found that "[t]he language of an 'inability to let the mind rest easily' lends content to the phrase 'moral certainty' ..., increasing, if anything, the prosecutor's burden of proof."  126 F.3d at 847.

The instruction in this case was similar to that in *Austin v. Bell*:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

126 F.3d at 846.  Accordingly, the court finds that King's claim as to the "reasonable doubt" jury instructions lacks merit.  *See, e.g., United States v. Perry*, 438 F.3d 642, 651 (6th Cir.), *cert. denied*, 547 U.S. 1139 (2006).

### VII.    The prosecution repeatedly violated Mr. King's due process rights by offering inadmissible, irrelevant and inflammatory evidence during both phases of Mr. King's trial.

#### A.    The First Phase.

King claims that prosecutorial error infected the trial from voir dire through sentencing.  He specifically refers to the following during the guilt phase:  the prosecution's question during voir dire as to whether any of the jurors believed that the use of drugs by a victim justifies blowing the top of her head off; the prosecution's theory that the blood in Sexton's car came from Ms. Smith, despite the evidence that the blood was from the Grainger County victim;  the introduction of the testimony of Lori Eastman Carter; and closing arguments designed only to inflame the passions of the jury.

68

**B.      The Second Phase.**

During the penalty phase, King claims the prosecution committed the following errors:  the prosecution argued at length about the facts of the prior Grainger County homicide; the prosecution told the jury that to return a life sentence would be to disregard their oaths as jurors and their duty to follow the law; the prosecution told the jurors that they had a civic duty to protect society; the prosecution asked the jury to penalize King for entering a plea of not guilty; and the prosecution cross-examined King about Ms. Smith's skull, about his two juvenile convictions for armed robbery, about the dismissed juvenile charge, and about the Grainger County homicide as well as the conviction for assault with intent to commit aggravated kidnaping.

**C.      The law requires reversal as a result of these deliberate
         actions.**

King contends that the prosecution acted deliberately and that the cumulative effect of the errors requires reversal of his conviction and sentence.  The Tennessee Court of Criminal Appeals in post-conviction proceedings determined that, by failing to raise them on direct appeal, King had waived his claims "that his due process rights were violated by the prosecution's 'offering inadmissible, irrelevant and inflammatory evidence' during both the guilt and penalty phases of his trial." *King v. State*, 1997 WL 416389 at *18.  That being so, King has procedurally defaulted this claim.

**VIII.  The State of Tennessee submitted evidence of an invalid
conviction to support the "prior crime of violence" aggravating factor.**

This claim refers to King's conviction in Grainger County, Tennessee, for the first degree murder and aggravated kidnapping of Todd Lee Millard. Mr. Millard's murder occurred prior to Ms. Smith's murder in Knox County, but King and Sexton were not arrested for the murder until after their arrest for Ms. Smith's murder. While the case against King for Ms. Smith's murder was pending, he pleaded guilty in the Millard case pursuant to a plea agreement and received concurrent life sentences. These convictions were then used against King in the Smith case as an aggravating circumstance to support the death penalty.

After he was convicted of Ms. Smith's murder and sentenced to death, King filed a state petition for post-conviction relief in the Millard case, arguing that his guilty pleas were not free and voluntary because he was not advised by the trial court that his Grainger County convictions could later be used as enhancement factors in his Knox County case. The trial court denied post-conviction relief and the Tennessee Court of Criminal Appeals affirmed. *King v. State*, 1990 WL 198178 (Tenn. Crim. App. Dec. 11, 1990), *perm. app. denied, id.* (Tenn. 1991).

King next filed a federal habeas corpus petition with the same argument and it was denied. The Sixth Circuit affirmed the denial of habeas relief, holding that the State's use of the Grainger County murder conviction "as an aggravating circumstance in the sentencing of an unrelated but pending murder charge" was "a collateral consequence of the plea, about which King need not be advised in order for his plea to be found voluntary." *King v. Dutton*, 17 F.3d 151 (6th Cir.), *cert. denied*, 512 U.S. 1222 (1994).

In this proceeding King now maintains his innocence of the Grainger County offenses. He contends that had statements consistent with his innocence been revealed to him, he would not have pleaded guilty to first degree murder. King refers to an alleged statement of Sexton to the Grainger County police that he, Sexton, alone killed Mr. Millard while King sat in the car and an alleged statement he made to Jerry Childress that he was not involved in Mr. Millard's death, which Mr. Childress allegedly related later to the authorities. He also contends he was induced to plead guilty by his attorney who had promised him a package deal with the Knox County charges for life imprisonment. King claims that had he known he would not receive a plea bargain from Knox County, but instead the Grainger County convictions would be used as an aggravating circumstance, he would not have pleaded guilty. King insists that, although he was present with Sexton at the time of the Grainger County offenses, once he realized that Sexton was going to kill the victim, he stated he wanted no part in the murder, tried to prevent it, and stayed in the car.

King did not present this claim to the Tennessee state courts and thus the claim is procedurally defaulted. King contends his default should be excused because he can demonstrate both cause and actual prejudice, and because he has made a showing of factual innocence.

As cause, King argues that the State withheld the exculpatory statements; he also argues that his attorney failed to conduct a reasonable investigation and discover the statements. This argument overlooks the fact that the state courts, a federal district court, and the Sixth Circuit have all upheld the validity of King's guilty plea in the first degree murder

71

of Mr. Millard. In addition, this court has previously determined that King is not actually innocent of the death penalty and thus cannot use factual innocence to excuse his procedural default.

> **IX. Both Terry King and Joseph Randall Sexton participated in the same homicide but received drastically different punishment. Joseph Randall Sexton was the principal in one homicide, Terry Lynn King was the principal in the second, but because of the circumstances under which the present case was tried, Joseph Sexton received life imprisonment in both cases while Terry Lynn King was sentenced to death. The Tennessee statute and the prosecutors' manipulation of that statute was arbitrary and capricious and violated the Fifth, Sixth, Eight, and Fourteenth Amendments to the Constitution of the United States.**

The respondent contends that this claim was procedurally defaulted. King raised this claim in his petition for post-conviction relief. [Addendum 3, Technical Record of Post-Conviction Proceedings, Vol. I, Comprehensive Petition for Post-Conviction Relief (hereinafter T.R.), p. 86[9]]. On appeal to the Tennessee Court of Criminal Appeals from the denial of post-conviction relief, King did not include this claim in his brief but rather in an Addendum attached to the brief without argument. [Addendum 4, Document A, Brief of Appellant, Addendum (hereinafter Add.), p. 141]. In the opening paragraphs of the Addendum to the brief, King's counsel stated that they have included in the Addendum "a series of issues which they seek to preserve on behalf of Mr. King." [*Id.* at 140]. Counsel also stated that they "stand ready to brief any such issues at length if the Court so desires." [*Id.*].

---

[9]Page references are to the sequential page numbers of the Technical Record, not of the Post-Conviction Petition itself.

The Addendum set forth seven claims, all without argument. The Tennessee Court of Criminal Appeals did not address any of the seven claims, nor did the Tennessee Supreme Court. Respondent contends that King waived consideration of these claims because he did not include them in his brief to the Tennessee Court of Criminal Appeals, as required by Rule 27 (a) (4) & (7) of the Tennessee Rules of Appellate Procedure. Respondent also refers to Rule 10(b) of the Rules of the Court of Criminal Appeals of Tennessee, which provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."[10]

King avers that he did exhaust these claims by including them in his post-conviction petition and in the addendum to the brief on appeal. This court disagrees. Because King did not include the claims in his brief, and only in an addendum without argument, the court finds that he waived consideration of the claims in the Tennessee Court of Criminal Appeals

---

[10]Respondent also contends that King waived these claims because he did not include them in his Rules 11 application for permission to appeal to the Tennessee Supreme Court. In the past, the required state court review included review by the Tennessee Supreme Court. *Picard v. Connor*, 404 U.S. 270 (1971). On June 28, 2001, however, the Tennessee Supreme Court promulgated Rule 39, which provides in pertinent part that a claim which has been presented to the Tennessee Court of Criminal Appeals is deemed exhausted. In *Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003), *cert. denied*, 541 U.S. 956 (2004), the Sixth Circuit held "that Rule 39 rendered Tennessee Supreme Court review 'unavailable' in the context of habeas relief." The court also held that Rule 39 was not a change in Tennessee law, but only a clarification of existing law, and thus it should be applied retroactively so as to prevent procedural default. Thus, King's failure to include the claims in his Rule 11 application is no longer relevant to the issue of procedural default.

and thus has procedurally defaulted the claims in this court. Nevertheless, out of an abundance of caution, the court will consider the claims on the merits.[11]

With respect to King's claim that the imposition of the death sentence was arbitrary and capricious under the Tennessee statute, the court finds that the claim lacks merit. King contends that because of the significant delay of the indictment for Ms. Smith's murder in Knox County, the Grainger County case was resolved and King was convicted of first degree murder prior to the return of the Knox County indictment. Thus, when King went to trial in Knox County in the case in which he was the principle participant, he was already convicted of first degree murder in Grainger County, a strong aggravating circumstance. On the other hand, Sexton had not yet been convicted of first degree murder in Knox County when he faced the Grainger County charges in which he was the principle participant and was able to resolve those charges without the aggravating circumstance of a prior violent felony.

To the extent King alleges that the State should not have been allowed to use as an aggravating circumstance an offense that was unadjudicated at the time of the instant offense, the court has already found that this claim was procedurally defaulted, *supra* at 71-73. King also avers that the disparate treatment of him and Sexton shows that the death penalty was arbitrarily applied in this case. In this regard, it appears that he is referring to the State's use

---

[11]The court previously ordered the parties to brief the exhaustion issue on these claims and additionally ordered the parties to brief the merits of each claim, with factual and legal support. [Court File No. 152]. The parties have done so. [Court File No. 158, Supplement Brief of Petitioner; Court File No. 169, Supplement Brief of Respondent].

of the assault with intent to commit aggravated kidnapping, which was committed only three days after the killing of Mrs. Smith.

Under Tennessee law, for purposes of the aggravating circumstance of prior violent felony, "the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced." *State v. Nichols*, 877 S.W.2d 722, 735 (Tenn. 1994). The discretion of the prosecution in this regard does not violate the Constitution. *See Gregg v. Georgia*, 428 U.S. 153, 199 (1976). King is not entitled to relief on this claim.

**X.    At the time Terry Lynn King entered a plea of guilty to first-degree murder in Grainger County on May 3, 1984, he had been charged in the present case but was not represented by counsel and hence did not receive any advice of counsel to the effect that his conviction in Grainger County could be used as an important and powerful aggravating circumstance in his eventual trial in the present case in Knox County. He had retained counsel Tommy Hindman on another Knox County case. Despite this pre-existing attorney/client relationship, Mr. King was questioned on the Knox County case in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.**

To the extent King challenges the validity of his Grainger County guilty plea, the court previously noted, *supra* at 73, that the state courts, a federal district court, and the Sixth Circuit have all upheld the validity of King's guilty plea in the first degree murder of Mr. Millard. With respect to King's allegation that he was questioned in the instant case without benefit of counsel who was representing him on another matter, that claim was raised in the Addendum in the post-conviction appeal. [Add. at 142].

The Supreme Court has held that the right to counsel under the Sixth Amendment is "offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (internal quotation marks and citation omitted). Thus, "a defendant's statement regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." *Texas v. Cobb*, 532 U.S. 162, 168 (2001). This claim lacks merit.

**XI.    The Tennessee Death Penalty statute codified at 39-2-203 (1982) was unconstitutional in the following respects:**

a)      The statute failed to require the jury to make specific findings as to the presence or absence of mitigating circumstances but required written findings of aggravating circumstances, hence emphasizing the aggravating circumstances in the jury's consideration and preventing effective appellate review.

b)      The statute relieved the state of its burden of proof and shifted the burden to the defendant to show that mitigating evidence outweighed the aggravaing evidence.

c)      The statute permitted inadmissible, non probative and unreliable evidence to be used against the defendant during the sentencing phase.

d)      The statute made death mandatory when the aggravating circumstances outweigh the mitigating circumstances without permitting the jury to show mercy.

e)      The statute failed to provide for adequate appellate review of proportionality of the capital defendant's death sentence. *State*

76

> *v. Black*, 815 S.W.2d 166, 192 (Tenn. 1991 ) (Reid, concurring and dissenting).

> f) T.C.A. Section 39-2-203(h) prohibited the jury from understanding the nature and effect of a non-unanimous verdict because telling the jury that its verdict must be unanimous was a fiction because no such unanimity was in fact needed for a life sentence. *California v. Ramos*, 463 U.S. 992 (1983).

King has failed to cite any authority holding the Tennessee Death Penalty Act unconstitutional. The court notes at the outset that the Sixth Circuit has held that Tennessee's death penalty statute is constitutional. *Workman v. Bell*, 178 F.3d 759, 778 (6th Cir. 1998), *cert. denied*, 528 U.S. 913 (1999).

Subparts (a) - (c) were raised by King on direct appeal.[12] The Tennessee Supreme Court gave short shrift to these arguments.

> Defendant also raises the question of the constitutionality of the Tennessee Death Penalty Act, evidently as a cautionary action as he does not discuss the issue in any detail in his brief. On reference to the motion which is the predicate of the assignment, we find that defendant raised no issue, nor advanced any argument that has not been considered and overruled in several prior cases.

*State v. King*, 718 S.W.2d at 250 (citing *State v. Austin*, 618 S.W.2d 738 (Tenn. 1981)). For the following reasons, the conclusion of the Tennessee Supreme Court was neither contrary to, nor did it involve an unreasonable application of, federal law.

---

[12]King raised these issues in the trial court by way of a motion to declare Tennessee's death penalty statute unconstitutional [Addendum 1, Technical Record on Direct Appeal, Vol. I, pp. 62-64], which was denied [*id*. at 103]. On appeal to the Tennessee Supreme Court, he argued in his brief that the Tennessee death penalty statute is unconstitutional and referred to his previous motion. [Addendum 2, Document A, Brief of Appellant, p. 31].

77

With respect to King's claim that the statute failed to require the jury to make specific findings as to mitigating circumstances, the court is not aware of any constitutional requirement in that regard. *See Martin v. Maggio*, 711 F.2d 1273, 1287 (5th Cir. 1983), *cert. denied*, 469 U.S. 1028 (1984) ("The Constitution simply does not require such a procedure."); *see also Austin v. Bell*, 927 F. Supp. 1058 (M.D. Tenn. 1996) ("The Constitution does not require a jury that imposes a death sentence to make specific written findings of mitigating circumstances.").

As to King's claim that the statute shifted the burden to the defendant to show that mitigating evidence outweighed aggravating evidence, the State bears the burden of proving aggravating circumstances and the statute does not place upon the defendant the burden of proving mitigating circumstances. To the extent King contends that the statute implicitly places such a burden on the defendant, that is not unconstitutional. *Walton v. Arizona*, 497 U.S. 639, 649-50 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

With respect to King's claim that the statute permitted inadmissible and unreliable evidence to be used during the sentencing phase, he makes only a conclusory argument that this is so. As previously noted, the Sixth Circuit has held that Tennessee's death penalty statute is constitutional.

Subparts (d) - (f) were raised in the Addendum in the post-conviction appeal. [Add. at 142-43]. With respect to King's claim that the statute made death mandatory when the aggravating circumstances outweigh the mitigating circumstances, the Supreme Court has

78

never held "that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). So long as a jury is "allowed to consider and give effect to all relevant mitigating evidence", as is the case in Tennessee, the statute is not impermissibly "mandatory." *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990); *see also Kansas v. Marsh*, 548 U.S. 163, 171 (2006) ("So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death.") (citations omitted). This claim lacks merit.

As to King's claim that the statute failed to provide adequate appellate proportionality review, the Supreme Court has held that the Constitution does not require a proportionality review. *Pulley v. Harris*, 465 U.S. 37, 44 (1984). This claim lacks merit.

With respect to King's claim that the statute prohibited the jury from understanding the nature and effect of a non-unanimous verdict, he claims that unanimity is not needed for a life sentence and thus it is error to instruct a jury that its verdict must be unanimous. In *Jones v. United States*, 527 U.S. 373 (1999), the Supreme Court held that there is no constitutional requirement that a capital sentencing jury must be informed of the consequences of their failure to reach a unanimous decision. *Id*. at 381-82. This claim lacks merit.

> **XII.    The trial court failed to cure the facial unconstitutionality of the Tennessee death penalty statute of its errors in the following instructions:**

79

a) The trial court failed to define "aggravation" or "mitigation" and hence failed to provide the appropriate guidance to the jury in evaluating the meaning of those terms.

b) The trial court failed to instruct the jury specifically that it could consider the fourteen non-statutory mitigating circumstances which were specifically requested by defense counsel and which were referred to the court only as "any other mitigating circumstances you may find" rather than as specific mitigating circumstances which it could consider. (TR 948).

c) The trial court emphasized the mandatory nature of the death penalty statute and the ambiguous standard contained therein by the use of the Pattern Jury Instruction set forth on page 948 of the transcript to the effect:

> If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt and said circumstances are not outweighed by any sufficiently substantial mitigating circumstances, the sentence shall be death.

without an explanation of the following:

1) What constitutes a "sufficiently substantial" mitigating circumstance to offset any aggravating circumstance that the jury might find.

2) Whether the meaning of the word "substantial" is a qualitative or quantitative matter.

3) Whether the balancing test to be conducted by the jury was a qualitative rather than a quantitative balancing test. *E.g., State v. Howell*, 868 S.W.2d at 216 (emphasizing that the test is to be qualitative).

4) That the jury could place whatever weight it might deem appropriate on any of the aggravating or mitigating circumstances it might find.

5)  The use of the plural term "mitigating circumstance*s*" instructs the jury that they must unanimously find more than on, when that is not a legal requirement.

6)  The jury's findings on mitigating factors did not have to be unanimous. *See Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997).

These claims were raised in the Addendum in the post-conviction appeal. [Add. at 143-44]. With respect to the first claim, King avers that the trial court's failure to define "aggravation" or "mitigation" amounted to constitutional error. The Tennessee Supreme Court on direct appeal determined that the trial court did not err in refusing to define "to aggravate" because it "is a term in common use and not a legalism beyond the understanding of the juror." *State v. King*, 718 S.W.2d at 249. "To mitigate" would fall into the same category.

Under Tennessee's death penalty scheme, in order to impose a death sentence, a jury must find at least one statutory aggravating circumstances. The jury is also instructed as to applicable mitigating circumstances and further told that they may consider any other mitigating circumstances they may find. Such was the instruction in King's case. [Addendum 1, Transcript of the Trial, Vol. XIX, pp. 947-48]. The instruction was not unconstitutional and this claim lacks merit. *See Gregg v. Georgia*, 428 U.S. 153, 196-98 (1976).

As to King's second claim in this section, the Tennessee Supreme Court held that the trial court did not err in refusing to instruct the jury to consider fourteen non-statutory mitigating circumstances which were requested by defense counsel. *State v. King*, 718 S.W.

2d at 249. This conclusion was neither contrary to, nor did it involve an unreasonable application of, federal law. *See Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998).

With respect to King's third claim in this section, the instruction to the jury was similar to the instruction found constitutional by the Court in *Buchanan*. *Id*. at 277. This claim lacks merit.

> **XIII.  Section 39-2-203(c) of the Tennessee Code permits the court to instruct on *any matter* which it deems relevant to the punishment without guiding the court or the jury as to what such items might be. The statute thus allows the introduction of legally irrelevant evidence which does not go to any of the statutory aggravating circumstances, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.**

This claim was raised in the Addendum in the post-conviction appeal. [Add. at 144]. King contends that, by its very terms, the statute purports to authorize the admission of irrelevant evidence. The claim lacks merit for the following reason.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id*. at 604-05 (footnotes omitted). King's claim overlooks the fact that the Tennessee Supreme Court has construed the above referenced statute as enlarging the defendant's ability to introduce relevant mitigation evidence, as required by *Lockett*. *See  State v. Johnson*, 632 S.W.2d 542, 548 (Tenn. 1982) (in enacting this statute, the Tennessee legislature went "even further than is required by" *Lockett*); *see*

82

*also State v. Bates*, 804 S.W.2d 868, 880 (Tenn. 1991) ("We have held that under the statute evidence is relative to punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant.").

> **XIV.  Death by electrocution in the State of Tennessee constitutes a physically cruel and inhuman punishment in violation of the Eighth Amendment of the Constitution of the United States because of the mental and physical torture which the process of death by electrocution imposes upon the individual who dies in such a fashion.  The post-conviction court further erred by refusing to consider petitioner's evidence of this cruel and inhuman process.  (Post-conviction hearing, III, 296-300; IV, 301-306).**

This claim was raised in the Addendum in the post-conviction appeal [Add. at 144-45] and is now moot.  In 2000, the Tennessee legislature passed a law providing for execution by lethal injection.  Tenn. Code Ann. § 40-23-114(a).  Because he committed his offense prior to January 1, 1999, King may elect by written waiver to be executed by electrocution instead of lethal injection.  *Id*. § 40-23-114(b).  Should he choose to make such a waiver, King would waive any claim that electrocution is unconstitutional.  *See Stewart v. LaGrand*, 526 U.S. 115, 119 (1999).

> **XV.  Death by lethal injection is cruel and unusual punishment which violates the Eighth Amendment to the United States Constitution.**

This claim has not been presented to the state courts, either on direct appeal or in post-conviction proceedings, because it was not an issue at that time.  Nevertheless, as far as this court is aware, Tennessee's provision for death by lethal injection has not been ruled unconstitutional.  *See, e.g., Harbison v. Little*, 571 F.3d 531, 539 (6th Cir. 2009); *State v.*

*Jordan*, 325 S.W.3d 1, 87-88 (Tenn. 2010); *Thomas v. State*, 2011 WL 675936 at *46 (Tenn. Crim. App. Feb. 23, 2011). King is not entitled to relief on this claim.

## XVI. The length of time between imposition of sentence and execution constitutes cruel and unusual punishment.

This claim has not been presented to the state courts, either on direct appeal or in post-conviction proceedings. Accordingly, King has procedurally defaulted this claim. In any event, this claim lacks merit. *See Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I write only to point out that I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

## XVII. The court and the district attorney excused prospective jurors who could not consider the death penalty by virtue of the free exercise of their religion. See TR 154-156. The court and the State therefore violated the defendant's rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution.

This claim was raised in the Addendum in the post-conviction appeal. [Add. at 145]. It refers to one juror who stated she did not believe in capital punishment because of the biblical admonition against killing and that she could not impose the death penalty. [Addendum 1, Transcript of the Trial, Vol. VIII, p. 599 - Vol. IX, p. 604]. The trial court granted the State's motion to remove the juror for cause. [*Id.* at 605].

In *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), the Supreme Court held that jurors in a death penalty case may not be excluded merely "because they voiced general

objections to the death penalty or express conscientious or religious scruples against its infliction." Nevertheless, "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). The proper standard for evaluating such a claim is "whether a juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1985)).

In this case, the juror was removed for cause based upon her inability to impose the death penalty. The fact that her feelings were based upon her interpretation of the Bible was not a religious test and King is not entitled to relief on this claim.

### XVIII. Mr. King was entitled to a new trial and/or a new sentencing hearing based on the cumulative errors which occurred during his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

The Tennessee courts found any errors in King's case to be harmless. King contends that the cumulative effect of the errors requires reversal of his conviction and sentence. He raised this claim in post-conviction proceedings and the Tennessee Court of Criminal Appeals concluded that "[e]ven when viewed cumulatively, we do not find that the sum total of these errors robbed the petitioner of a fair trial at either the guilt or penalty phases." *King v. State*, 1997 WL 416389 at *18.

The Sixth Circuit has held in the past that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court

85

may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness. *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). These cases, however, were decided prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which amended 28 U.S.C. § 2254 with regard to the standard of review in habeas corpus cases.

The Supreme Court has not held that a district court may look to the cumulative effects of trial court errors in deciding whether to grant habeas corpus relief. *See Williams v. Anderson*, 460 F.3d 789, (6th Cir. 2006) (death-penalty decision stating, "[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may be it binds us."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (death-penalty decision stating, "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447(6th Cir. 2002) (death-penalty decision stating, "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *but see DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002) (constitutional errors that might have been harmless when considered individually maybe be cumulated in a capital case, leading to a reversal of a death sentence).

86

Accordingly, because there is no Supreme Court precedent in this regard, King cannot demonstrate that the Tennessee Court of Criminal Appeals' rejection of his cumulative effect argument was either contrary to, or an unreasonable application of, clearly established federal law as required by *Williams v. Taylor*. *See Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004) (death penalty decision; petitioner's cumulative error theory lacks merit because it "depends on non-Supreme Court precedent").

To the extent King contends that *Kyles v. Whitley*, 514 U.S. 419 (1995) required the Tennessee Supreme Court to conduct a cumulative error analysis, this court disagrees. *Kyles* was concerned with the suppression by the government of material evidence favorable to the defense in violation of *Brady*.

IV.    Conclusion

King is not entitled to relief under 28 U.S.C. §2254, the respondent's motions for summary judgment will be **GRANTED**, and the petition for the writ of habeas corpus will be **DENIED**.  The stay of execution previously entered in this matter will be **VACATED**. The petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**.  28 U.S.C. §2253(c).

**AN APPROPRIATE ORDER WILL ENTER.**

_____s/ Leon Jordan_____
United States District Judge

87